United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 1, 2006**

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

_____

m 05-40671

_____

STATE OF TEXAS,

Plaintiff-Appellant,

VERSUS

AMERICAN TOBACCO CO., ETC.; ET AL.,

Defendants,

BROWN & WILLIAMSON TOBACCO CO.,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Eastern District of Texas
m 5:96-CV-91

_____

Before SMITH and STEWART, Circuit Judges,
and HANEN,[*] District Judge.

ANDREW S. HANEN, District Judge:

_____

[*] District Judge of the Southern District of
Texas, sitting by designation.

The issue before this Court involves the proper interpretation of the settlement agreement between the State of Texas and five large cigarette manufacturers. Specifically, this Court must determine whether Brown & Williamson Tobacco Corporation n/k/a Brown & Williamson Holding, Inc. ("B&W") breached its obligations under the settlement agreement by failing to report cigarettes that

B&W manufactured for Star Tobacco & Pharmaceuticals ("Star") as its own for the purpose of calculating B&W's annual payments to Texas. As a consequence of B&W's alleged underreporting, the State claims it was deprived of approximately $16,420,252 in settlement payments between the years 1999 and 2002. For the reasons stated below, we affirm.

## I. FACTUAL BACKGROUND

On March 28, 1996, the State of Texas sued several major tobacco companies seeking reimbursement for various smoking-related health care expenditures. Almost two years later, on January 16, 1998, Texas entered into a settlement agreement with B&W, Philip Morris, Inc., R.J. Reynolds Tobacco Co., Lorillard Tobacco Co., and United States Tobacco Co. (collectively referred to as the "Settling Defendants").[1] The settlement agreement, which was approved by the district court on January 22, 1998, released the tobacco companies from all past and future claims arising out of the use of, or exposure to, their tobacco products. In return, the tobacco companies agreed to make annual payments to Texas and to comply with certain restrictions, including various marketing restrictions. The parties also agreed that the United States District Court for the Eastern District of Texas, Texarkana Division, would retain juris-

diction over the parties and subject matter of the settlement for the purposes of implementing and enforcing the agreement.

Since the parties executed the original "Comprehensive Settlement Agreement and Release" ("Original Agreement"), they have amended it twice.[2] On July 24, 1998, the parties entered into the Stipulation of Amendment to Settlement Agreement and for Entry of Consent Decree ("1998 Amendment"), and on June 8, 2001, the parties entered into the Agreement to Amendment to Settlement Agreement ("2001 Amendment").

The 1998 Amendment reflects Texas' exercise of its rights under the Original Agreement's "Most Favored Nation" provision to adopt the more favorable terms of the settlement agreement reached between the Settling Defendants and the State of Minnesota on May 8, 1998. The Original Agreement tied the formula for calculating the annual payments to the "respective share of sales of cigarettes by unit for consumption in the United States." Apparently, some of the Settling Defendants began marketing cigarettes in "two for one" or "buy two get one free" promotions. "Free" cigarettes given as part of such promotions would likely be excluded from the annual payment calculations of the Original Agreement because they would not have been considered cigarettes "sold." Perhaps recognizing the potential decrease in the amount of the settlement payments presented by these promotions, the settlement agreement reached between the State of Minnesota and the Settling Defendants tied the Settling Defendants' annual payment obligations to shipped ciga-

---

[1] Texas was the third state to reach a major settlement agreement with the major tobacco companies. The Settling Defendants initially settled with Mississippi, then followed in order by Florida, Texas, and Minnesota. The Settling Defendants finally settled with the remaining forty-six (46) states, the District of Columbia, and the five (5) U.S. Territories through the Master Settlement Agreement. Texas attempted to introduce the Master Settlement Agreement into evidence in the court below; however, the district court sustained B&W's objection thereto and Texas has not appealed that ruling.

[2] The Original Agreement along with the two amendments are collectively referred to as the "Texas Settlement Agreement."

rettes. Texas and the Settling Defendants thereafter entered into the 1998 Amendment, which changed the annual payment provisions by tying the annual payment calculations to the "number of cigarettes shipped for domestic consumption." *See 1998 Am.*, at Appx. A (emphasis added).[3]

In late 1999, B&W entered into a Cigarette Manufacturing Agreement with Star, an independent tobacco company that was primarily engaged in developing reduced-risk tobacco products. B&W manufactured, sold, and shipped to Star per Star's specifications and requirements over 7.5 billion cigarettes between late 1999 and December 21, 2002 ("contract-manufactured cigarettes"). B&W was paid approximately one cent for each contract-manufactured cigarette, which resulted in B&W's making approximately $4 per thousand cigarettes.[4] Although B&W shipped the contract-manufactured cigarettes to Star, who then shipped them through its own distribution system for consumption, B&W did not include those cigarettes in its annual payment calculations to Texas.[5] Instead, B&W based its annual payment calculations on the shipment information that it reported to Management Science Associates, Inc. ("MSA, Inc.").

MSA, Inc. is an independent third party that has been collecting information related to tobacco companies' shipments to wholesalers for over thirty years.[6] As part of its Cigarette Research Audit ("CRA") program, MSA, Inc. collects and reports information from cigarette manufacturers concerning shipments to their wholesalers and distributors. These reports are sometimes referred to as "Shipments to Wholesale." The agreement between MSA, Inc. and B&W is such that B&W only reports the cigarettes it ships through its own distribution system. Therefore, B&W did not include the contract-manufactured cigarettes in the shipment information it reported to MSA, Inc. The MSA, Inc. reports are used by B&W and other cigarette manufacturers to analyze and monitor their respective sales and market shares. MSA, Inc. does not examine or verify the accuracy of the information that B&W provides.[7]

On May 27, 2004, over one year after B&W had stopped manufacturing cigarettes for Star, the State of Texas filed a Verified Motion to Enforce the Settlement Agreement, For an Accounting, and For a Preliminary Injunction claiming that B&W breached the agreement by failing to report as its own, and make settlement payments with respect to, the contract-manufactured cigarettes. B&W denied the allegations claiming that it was not required to include the contract-manufactured

---

[3] The 2001 Amendment clarified terms with respect to the net operating profit provision of Appendix A and is not material to the issues presented by this appeal.

[4] According to the district court, B&W's gross margin on its own cigarettes is 10 to 12 times greater.

[5] The district court found that the shipping costs associated with the contract-manufactured cigarettes were paid for by Star, risk of loss transferred to Star when the cigarettes left B&W's facilities, and all the taxes on these cigarettes were paid by Star.

[6] MSA, Inc. operates pursuant to various contractual agreements it has with private industry. Texas is not a party to any of those contracts.

[7] The parties agree that even though MSA, Inc. collects cigarette shipment information as part of its Cigarette Research Audit program, MSA, Inc. does not "audit" the shipment information, at least not in the classic financial sense of the term.

cigarettes in the annual payment calculations. On June 24, 2004, by agreement of the parties, the United States District Court for the Eastern District of Texas, Texarkana Division, heard argument and received evidence on whether B&W breached the agreement, and on whether Texas was entitled to an accounting.[8]

On March 28, 2005, the district court issued its Final Judgment in favor of B&W along with its Findings of Facts and Conclusions of Law. The court ruled that "under well-settled industry practice," the contract-manufactured cigarettes "were not B&W's cigarette shipments, they were not shipped to B&W's wholesalers, and they were properly excluded from B&W's shipments reported to MSA, Inc. or the calculation of B&W's payments under the Texas Settlement Agreement." *Opinion*, at 3. Furthermore, the district court ruled that the words "cigarettes shipped for domestic consumption" means those cigarettes shipped for domestic consumption as reported by MSA, Inc. *Id.* at 23.

Even though the court did not rule as to whether the Texas Settlement Agreement is ambiguous, the court based its ruling in part on the parties' course of performance.[9] The district court found that since its inception, all of the annual payments due under the Texas Settlement Agreement have been based on MSA, Inc.'s "Shipments to Wholesale" reports. It also found that this practice and course of performance was explicitly recognized by the parties in 2002 when the State and the Settling Defendants entered into an engagement letter with PriceWaterhouseCooper ("PWC"). PWC was engaged to collect "shipment volume data" from each Settling Defendant and, based on that data, to calculate the payments due under the Texas Settlement Agreement. The engagement letter specifically stated:

By January 15 of each year, request and collect from each Settling Defendant shipment volume data for the entire preceding calendar year. Seek and obtain written confirmation of such shipment volume data from [MSA, Inc.], and notify each State and each Settling Defendant if there exists a discrepancy between the volume data collected from the Settling Defendants and the confirmation obtained from [MSA, Inc.].

---

[8] By agreement, the district court deferred consideration of Texas' motion for an injunction. The injunction issue involved B&W's proposed business combination with R.J. Reynolds Tobacco Co. The State claimed it would result in an assignment of B&W's rights and obligations under the Texas Settlement Agreement without the State's consent in violation of Section 2 of the agreement. The issue was rendered moot prior to the trial court's ruling by the fact that B&W supplied the State with copies of the agreements affecting the business combination, which included provisions specifying that B&W would not assign its rights and obligations as part of the combination. The parties to the business combination also entered into an amendment reinforcing that position. Thus, the injunction issue is not material to this appeal.

[9] While the court did not expressly find that the Texas Settlement Agreement is unambiguous, it stated that it based its ruling in part on "the plain language of the Settlement Agreement." *Opinion*, at 22. Due to the fact that the trial court used language normally associated with the interpretation of an unambiguous contract, but then also relied on course of performance evidence, which is used only in interpreting ambiguous contracts, this Court is not certain whether the trial court considered the settlement agreement to be ambiguous. Ultimately, since ambiguity is a question of law, it is immaterial to the ultimate resolution of this appeal.

*Id.* at 13. The court found that the letter reflected the parties' recognition that the "shipment volume data" PWC was engaged to collect would be based on the Settling Defendants' shipments as reported to MSA, Inc. *Id.* Thus, the court concluded that the letter reflected the parties' course of performance and their understanding that the annual payments to Texas have always been based on shipments as reported to MSA, Inc. *Id.* at 14.

The district court also made findings of fact that the State knew about the Cigarette Manufacturing Agreement between B&W and Star during the approximately six years prior to filing its Motion to Enforce. The court found that the evidence was "undisputed that the State of Texas, including its Attorney General, were aware of B&W's contract manufacturing agreement with Star from its inception" and never claimed that B&W was obligated to make settlement payments with respect to the contract-manufactured cigarettes. *Id.* at 18.

## II. THE ANNUAL PAYMENT CALCULATIONS

At the heart of this appeal is the interpretation of the provisions in the Texas Settlement Agreement establishing the method for calculating the Settling Defendants' annual payments. The annual payment calculations are based on each Settling Defendant's share of 7.25% of $4 billion in 1998, $4.5 billion in 1999, $5 billion in 2000, $6.5 billion in 2001, $6.5 billion in 2002, $8 billion in 2003, and $8 billion in the years thereafter.[10] *1998 Am.*, at

11. These amounts are referred to as the "Applicable Base Payments." According to the State's witness Gary Wilson, the Applicable Base Payments are subject to two adjustments. The first adjustment takes into account inflation by increasing the dollar amount in the applicable year by the greater of three percent or the consumer price index. The second involves volume adjustment formulas set out in Appendix A of the 1998 Amendment.[11]

One of the main factors taken into consideration in the volume adjustment formulas is whether "the aggregate number of cigarettes shipped for domestic consumption by Settling Defendants in the Applicable Year…(the 'Actual Volume')" exceeds or is less than "the aggregate number of cigarettes shipped for domestic consumption by Settling Defendants in 1997 (the 'Base Volume')." *1998 Am.*, Appx. A, at (A). The annual payments are further affected by whether the Settling Defendants' net operating profits for the applicable year exceed each Settling Defendants' net operating profits in 1997. *Id.* at (B)(ii). Once the adjustments are applied to the Applicable Base Payments, the total annual payment owed to Texas from the Settling Defendants collectively is calculated.

After calculating the total annual payment, it is then necessary to determine each of the Settling Defendants' share, which is based on

---

[10] The "share" each Settling Defendant is obligated to pay is "pro rata in proportion to its Market Share." The parties agreed that 7.25% reflects Texas' share of national health care expenses arising

(continued...)

[10](...continued)
ing out of domestic cigarette consumption.

[11] Both the 1998 and 2001 Amendments contain an "Appendix A" that are slightly different. Although the 2001 Amendment theoretically superseded the 1998 Amendment, this Court will cite to the 1998 Amendment when discussing the Appendix A calculations.

that defendant's "Market Share." "Market Share" is defined by the 1998 Amendment as:

> [A] Settling Defendant's respective share of sales of Cigarettes, by number of individual Cigarettes shipped in the United States for domestic consumption, as measured by such Settling Defendant's audited reports of shipments of Tobacco Products provided to the U.S. Securities and Exchange Commission ("SEC") (or, in the case of any Settling Defendant that does not provide such reports to the SEC, audited reports of shipments containing the same shipment information as contained in the reports provided to the SEC) ("Shipment Reports").

*1998 Am.*, at 5. Thus, the first step is to calculate the total amount owed to Texas by taking into account the inflation and volume adjustments, and the second step is to apportion the amount each Settling Defendant is required to pay based on its individual market share.

For the first four years of the Texas Settlement Agreement, the Settling Defendants actually performed the annual payment calculations. Thereafter, PWC performed the calculations using data supplied by the Settling Defendants and confirmed by the MSA, Inc. reports. According to the testimony, throughout the life of the Texas Settlement Agreement, the Appendix A calculations have been based on the same shipment numbers as used in the Market Share calculations.

### III. SUMMARY OF THE ARGUMENTS

Texas argues that the Texas Settlement Agreement is unambiguous and that the 7.5 billion cigarettes that B&W manufactured for Star between 1999 and 2002 should have been included in the annual payment calculations. According to Texas, the agreement requires the Settling Defendants to report, and ultimately make settlement payments on, all "cigarettes shipped for domestic consumption." B&W shipped the contract-manufactured cigarettes to Star, which were then shipped to Star's distributors and wholesalers for domestic consumption. Therefore, the State concludes that the contract-manufactured cigarettes were "shipped for domestic consumption." It further argues that this interpretation complies with the parties' intent when they entered into the settlement agreement (to compensate Texas for the medical costs incurred by its smoking citizens) by focusing on who manufactures the cigarettes rather than who ultimately distributes them. Indeed, Texas points out that because Star is not a signatory to the Texas Settlement Agreement, Texas was never compensated for the health care costs associated with the domestic consumption of the contract-manufactured cigarettes. Had B&W reported those cigarettes as its own, Texas claims it would have received an additional $16,420,252 in settlement payments for the years 1999 through 2002. Therefore, B&W's failure to report as its own the contract-manufactured cigarettes constitutes a breach of the agreement.

Texas points out that if the Texas Settlement Agreement is unambiguous, the district court erred by taking into consideration evidence of the parties' course of performance.[12] As will be discussed in more detail below, it

---

[12] Texas did not object or argue during the bench trial that the course of performance evidence was inadmissible for the purposes of interpreting the language of the Texas Settlement Agreement. The first mention of that argument is in Texas' brief to this Court.

also argues that the district court improperly used the term "Shipment Reports," which is found in the definition of Market Share, to interpret the phrase "cigarettes shipped for domestic consumption," in Appendix A. *1998 Am.*, at 5 & Appx. A (A). Texas maintains that the market share calculations have nothing to do with the State; rather, they provide a "dispute resolution process" by which the Settling Defendants divide up their individual portions of the total annual payment owed to Texas.

B&W, on the other hand, argues that the contract-manufactured cigarettes were properly excluded from the annual payment calculations because they were not B&W's cigarettes and it was not required to report those cigarettes to MSA, Inc. It should be noted that as a subsidiary of a British corporation, B&W does not report to the SEC. Therefore, B&W reported as its shipments under the Texas Settlement Agreement the same shipments that it reported to MSA, Inc. Pursuant to the agreement between MSA, Inc. and B&W, B&W was not required to report the Star contract-manufactured cigarettes as its own. Even though the Texas Settlement Agreement does not specifically refer to MSA, Inc., B&W argues that the plain language of the Texas Settlement Agreement requires the annual payment calculations to be based on the Settling Defendants "audited" shipment reports, which are, in turn, the MSA, Inc. reports. B&W then argues that if there is any doubt about how the annual payments are calculated, such doubt is eliminated by the parties' course of performance.

According to B&W, the parties' course of performance supports their position because even the Settling Defendants who report to the SEC base their "Form 10K" reports on their MSA, Inc. reports. Indeed, according to B&W and the district court, all payments due under

the Texas Settlement Agreement have been based uniformly on shipments to wholesalers as reported to MSA, Inc. Therefore, B&W concludes that the parties agreed to use MSA, Inc. reports as the basis for determining the Settling Defendants' payment obligations when they incorporated the phrase "audited reports of shipments" into the settlement agreement.

## IV.    STANDARD OF REVIEW

Whether a contract is ambiguous is a question of law that is reviewed de novo. *Stinnett v. Colorado Interstate Gas. Co.*, 227 F.3d 247, 254 (5th Cir. 2000). While the interpretation of an unambiguous contract is a question of law that this Court reviews de novo, the interpretation of an ambiguous contract is a question of fact that is reviewed for clear error. *Id. See also, Tarrant Distributors Incorporated v. Heublein Incorporated*, 127 F.3d 375 (5th Cir. 1997).

## V. DISCUSSION

Neither of the parties has argued that the Texas Settlement Agreement is ambiguous, and the district court did not expressly find that the agreement is ambiguous.[13] However, the evidence presented to the district court dealt almost entirely with the parties' course of

---

[13] It should be noted that although Texas argues that the Texas Settlement Agreement is unambiguous, it has asserted for the first time on appeal points of error based on the contingency that this Court determines that an ambiguity exists. It argues that should the agreement be found to be ambiguous, the trial court erred because: (1) it deviated from the original intent of the agreement; and (2) it based its ruling on findings of fact which were clearly erroneous.

performance. Indeed, the district court's Findings of Fact and Conclusions of Law expressly took into consideration the course of performance evidence. Therefore, the Court must first address whether the Texas Settlement Agreement is ambiguous as a matter of law.[14]

## A. Texas Contract Law

The primary concern of a court in construing a written contract is to ascertain the true intentions of the parties as expressed in the instrument. *Gen. Accident Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd.*, 288 F.3d 651, 653 (5th Cir. 2002); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). Under Texas law, which the parties agree controls, a contract is viewed as of the time it was made and not in light of subsequent events. *Ervay, Inc. v. Wood*, 373 S.W.2d 380, 384 (Tex. Civ. App.—Dallas 1963, writ ref'd n.r.e.). "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). If a written contract is worded such that it can be given a definite or certain legal meaning, then it is not ambiguous. *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). When parties disagree over the meaning of an unambiguous contract, "[t]he intent of the parties must be taken from the agreement itself, not from the parties' present interpretation, and the agreement must

be enforced as it is written." *Purvis Oil Corp. v. Hillin*, 890 S.W.2d 931, 935 (Tex. App.—El Paso 1994, no writ).

If the contract's meaning is uncertain and doubtful, or it is reasonably susceptible to more than one meaning, it is ambiguous. *Coker*, 650 S.W.2d at 393–94 (Tex. 1983). Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732–33 (Tex. 1982); *Unity/Waterford-Fair Oaks, Ltd.*, 288 F.3d at 657. "Only after a contract is found to be ambiguous may parol evidence be admitted for the purpose of ascertaining the true intentions of the parties expressed in the contract." *Burlington Northern and Santa Fe Ry. Co. v. South Plains Switching, Ltd. Co.*, 174 S.W.3d 348, 358 (Tex. App.—Fort Worth 2005, no pet.); *see also*, *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996).

## B. The Ambiguity in the Texas Settlement Agreement

### 1. Appendix A and the Definition of Market Share

In order to understand the parties' disagreement, it is necessary to understand the nexus between Appendix A and the definition of Market Share. Appendix A ties the overall annual payment calculations to "the aggregate number of cigarettes <u>shipped</u> for domestic consumption." *See 1998 Am.*, at Appx. A. The Market Share calculations are based on the "individual Cigarettes shipped in the United States for domestic consumption, as measured by …[Shipment Reports]." Although there are minor differences in the

---

[14] A court may conclude that a contract is ambiguous even if the parties do not contend it is. *Hewlett-Packard Co. v. Benchmark Electronics, Inc.*, 142 S.W.2d 554, 561 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *see also J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

phrasing, a common sense approach dictates that both provisions take into account the number of cigarettes each Settling Defendant ships for domestic consumption. While Appendix A takes into account the <u>aggregate</u> number of cigarettes that the Settling Defendants have collectively shipped for domestic consumption, the Market Share provision takes into account the <u>individual</u> cigarettes that each Settling Defendant ships for domestic consumption.

The key difference between the two provisions, however, is that Appendix A does not mention "Shipment Reports." Under the definition of Market Share, the "individual Cigarettes shipped in the United States for domestic consumption" are measured by "Shipment Reports," which are defined as

> such Settling Defendant's <u>audited reports of shipments</u> of Tobacco Products provided to the [SEC] (or, in the case of any Settling Defendant that does not provide such reports to the SEC, <u>audited reports of shipments</u> containing the same shipment information as contained in the reports provided to the SEC).

*1998 Am.*, at 5 (emphasis added). In other words, Shipment Reports are "audited reports of shipments" that contain the type of shipment information that tobacco companies report to, or would report to, the SEC. Thus, at least in the Market Share provision, the "individual" number of cigarettes that have been shipped for domestic consumption is determined by Shipment Reports. Appendix A, however, is silent as to how the "aggregate" number of cigarettes shipped for domestic consumption is determined. The district court held that payments must be made only for shipments that would be included in the audited reports of tobacco shipments provided to the SEC. It then con-

cluded that such reports are based on the same information contained in the MSA, Inc. reports, which are generated pursuant to MSA, Inc.'s Cigarette Research Audit program.

Texas argues that the Appendix A calculations are completely separate from the Market Share calculations; therefore, the district court acted improperly when it took the defined term "Shipment Reports" out of the Market Share provision and applied it to the annual payment calculations provided for in Appendix A. Texas supports this argument by pointing out that the Market Share calculations occur only after determining the total annual payment owed Texas by the Settling Defendants collectively. It also points out that the State has nothing to do with the "dispute resolution process" provided by the Market Share provision in apportioning each Settling Defendants' annual payment. In essence, Texas argues that even though the number of cigarettes shipped for domestic consumption is measured by Shipment Reports under the Market Share calculations, the "aggregate" number of cigarettes shipped for domestic consumption under Appendix A are not. We find this argument untenable.

Contracts are construed in their entirety and it is the Court's duty "to consider each part with every other part so that the effect and meaning of one part on any other part may be determined." *Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333, 337 (Tex. 1980); *see also Unity/Waterford-Fair Oaks, Ltd.*, 288 F.3d at 653. "Indeed, courts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract." *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995).

9

Because contracts are read in their entirety, it is irrelevant that the term "Shipment Reports" is not mentioned in Appendix A. If taken to its logical conclusion, Texas essentially asks this Court to ignore the fact that Appendix A is silent as to how the number of cigarettes shipped for domestic consumption is determined. It asks this Court, instead, to presume that the actual number is based solely on the plain language of Appendix A, regardless of the description contained in the Market Share provision. The Texas Settlement Agreement, however, provides the means of determining both the aggregate number of cigarettes shipped for domestic consumption (under Appendix A) and the individual number of cigarettes that each Settling Defendant ships for domestic consumption (under the Market Share provision)—through the use of Shipment Reports.[15]

### 2. Audited Reports of Shipments

Under the plain language of the Texas Settlement Agreement, payments must be made based on "shipments" of cigarettes that would be included in "audited reports of shipments of Tobacco Products provided to the [SEC]." The district court, however, found that all settlement payments due under the Texas Settlement Agreement since its inception have been based on shipments as reported to MSA, Inc. Yet it also found that MSA, Inc. shipment reports are based on unaudited shipment

information.[16] Indeed, the MSA, Inc.'s CRA is essentially an honor system since MSA, Inc. accepts the information provided to it by each individual cigarette manufacturer without verifying whether the information is accurate. PWC, moreover, does not "audit" the shipment information that the Settling Defendants provide. Rather, it merely compares the MSA, Inc. numbers to those provided by the Settling Defendants, which are essentially the same numbers.

An ambiguity in a contract can be either "patent" or "latent." *CBI Indus., Inc.*, 907 S.W.2d at 520. A patent ambiguity is evident on the face of the contract while a latent ambiguity "arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter." *Id.* If a latent ambiguity arises, parol evidence is admissible for ascertaining the true intentions of the parties as expressed in the agreement. The classic example of a latent ambiguity cited by a variety of authorities is a contract that calls for goods to be delivered to the

---

[15] While Texas argues that the two provisions are completely separate, this Court notes that the trial testimony revealed that the numbers used in the Appendix A calculations are the same numbers used in the Market Share calculations. According to the district court's findings, those numbers have always been derived from the MSA, Inc. reports.

[16] Texas argued that B&W, by its own admission, breached the settlement agreement because it acknowledged that it uses the MSA, Inc. reports to comply with the agreement and also acknowledged that the MSA, Inc. reports are unaudited. Texas raises the argument and glosses over the fact that every single Settling Defendant uses MSA, Inc. reports either directly or indirectly to comply with the Texas Settlement Agreement. Therefore, none of the annual payments that Texas has collected throughout the life of the Texas Settlement Agreement have been based on "audited" shipment information. Even when Texas hired PWC to perform the annual payment calculations, its instructions were to use the MSA, Inc. information as a check on the information provided by the Settling Defendants.

"green house on Pecan Street" when there are, in fact, two or more green houses on Pecan Street. *See*, *e.g.*, 11 WILLISTON ON CONTRACTS § 33.40 (4th ed.). In the instant case, we have a similar situation, albeit for the opposite reason. Instead of having multiple green houses or, in this instance, "audited" reports, we have none.

The classic contractual use of the word "audit" is to describe a formal examination of an individual's or organization's accounting records, financial situation, or compliance with some other set of standards. BLACK'S LAW DICTIONARY 140 (8th ed. 2004). Stated differently, an audit is "[a]n examination into accounts or dealings with money or property by proper officers, or persons appointed for that purpose." NEW WEBSTER'S DICTIONARY 65 (1981). Indeed, in other portions of the Texas Settlement Agreement, when this type of audit is contemplated, the parties have spelled it out in detail. When detailing the manner in which net operating profits should be determined for the volume adjustments, Appendix A specifically demands data from "financial statements prepared in accordance with generally accepted accounting principles and audited by a nationally recognized accounting firm." Yet, when addressing the data contained in the Shipment Reports, the Settlement Agreement is completely lacking in detail. As the trial court noted, no Settling Defendant has ever provided audited shipment reports to the SEC, nor does B&W (who is not required to report to the SEC) maintain or submit audited reports of its cigarette shipments for the purposes of complying with the Texas Settlement Agreement.

The phrase "audited reports of shipments" as used in the agreement is a latent ambiguity—one which appears only by reason of a collateral matter. As such, the trial court's use of extrinsic evidence to determine the parties' intent was not error. The only audited shipment reports, albeit not audited in the classic sense, that are submitted in compliance with the Texas Settlement Agreement are those generated by MSA, Inc. pursuant to its Cigarette Research Audit program. That being the case, B&W's use of MSA, Inc. figures was not a breach of the Texas Settlement Agreement.

## VI.  CONCLUSION

Based upon the foregoing, we find that the district court's use of extrinsic facts to interpret a latent ambiguity was not error. Further, we find that its findings of fact are supported by the evidence and certainly are not subject to attack under the clear error standard of review. Therefore, the State of Texas shall take nothing by virtue of its claim of breach of the Texas Settlement Agreement. Further, this Court finds that its request for an accounting was appropriately denied.

The judgment of the district court is AFFIRMED.