In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00028-CV


______________________________




EMPLOYERS REINSURANCE CORPORATION, Appellant



V.



APRIL GORDON, INDIVIDUALLY, AND AS NEXT FRIEND


OF DAKOTA GORDON, AND RONNIE GORDON, Appellees



 


On Appeal from the 71st Judicial District Court


Harrison County, Texas


Trial Court No. 040641




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Justice Carter



O P I N I O N



 This is an appeal from a summary judgment entered in favor of April Gordon, Individually,
and as Next Friend of Dakota Gordon, and Ronnie Gordon (collectively the Gordons). At issue is
the interpretation of a short, seemingly simple provision of a high-low settlement agreement entered
into by the Gordons and Employers Reinsurance Corporation (ERC). We reverse and remand.

I. BACKGROUND AND ROLES OF THE PARTIES

 In 1999, April and Ronnie Gordon sued Good Shepherd Medical Center alleging negligence
in connection with a brain injury sustained by their daughter. The jury heard evidence that the life
care for the daughter would range from $4.6 million to $9.2 million. Good Shepherd had a self-insured retention (SIR) in the amount of $2 million, and ERC provided excess insurance coverage
for Good Shepherd for any liability in excess of $2 million, up to $30 million. 

 During the litigation, ERC's claim consultant, Debra Crawford Masters, recommended Good
Shepherd settle the case since it appeared quite possible that a judgment could exceed even the
excess insurance coverage. ERC's correspondence with Good Shepherd indicated that ERC feared
a very large verdict. However, Good Shepherd did not offer to settle. In an e-mail, Masters advised
Good Shepherd of ERC's concerns regarding the possibility of a very large verdict and informed
Good Shepherd that ERC would attempt to negotiate a high-low settlement with the Gordons, urging
that such action would protect both ERC and Good Shepherd from excess exposure. 

 While the jury was deliberating the Gordons' case against Good Shepherd, James Doyle,
cocounsel for ERC, (1) began negotiations with the Gordons' attorney, Michael Heygood, partner to the
Gordons' appellate counsel. Doyle drafted a proposed settlement agreement. After Doyle made the
changes Heygood wanted in the agreement, the two signed the handwritten settlement agreement. 
The parties refer to this agreement as a high-low settlement agreement. 

II. PROVISION AT ISSUE

 The one-page, handwritten settlement agreement provides, in pertinent part, the following:

 Parties agree:

 1. TO A $375 THOUSAND LOW AND A $3.5 MILLION HIGH ON THAT
PORTION OF ANY JUDGMENT AGAINST GOOD SHEPHERD AND ITS
NURSES IN EXCESS OF $2 MILLION, AFTER ALL APPEALS ARE
EXHAUSTED.


 2. THAT IF HOSPITAL OR ITS NURSES SETTLE WITH PLAINTIFFS BEFORE
JUDGMENT EITHER PARTY HAS RIGHT [SIC] TO VOID AGREEMENT.

 

 3. BOTH SIDES RESERVE THE RIGHT TO APPEAL.


The parties disagree as to the meaning of provision 1.

III. THE JURY VERDICT IN UNDERLYING SUIT AND SUBSEQUENT LITIGATION

 The jury did, in fact, return a verdict in favor of the Gordons, but the amount of the verdict
against Good Shepherd was surprisingly less than it appears all parties had anticipated, amounting
to $562,000.00. (2) The Gordons sought to recover from ERC $375,000.00 pursuant to the agreement.

IV. COMPETING INTERPRETATIONS

 ERC argues that provision 1 unambiguously provides that ERC will pay one of the following
two amounts:

 a $375,000.00 low on that portion of any judgment against Good Shepherd in excess of $2
million

 

 OR

 

 a $3.5 million high on that portion of any judgment against Good Shepherd in excess of $2
million.


 ERC advances the interpretation that only a verdict exceeding $2 million against Good
Shepherd would trigger any obligation to pay any amount under the agreement. Therefore, since the
jury verdict was less than $2 million, ERC claims to owe nothing to the Gordons under this high-low
agreement.

 According to the Gordons, provision 1 unambiguously provides that ERC will pay one of
these two amounts:

 a $375,000.00 low


 OR


 a $3.5 million high on that portion of any judgment against Good Shepherd and its nurses
in excess of $2 million.


The Gordons argue that the agreement is unambiguous and means that ERC is obligated to pay the
$375,000.00 low no matter what. According to their interpretation, only the high figure is connected
to the condition that the jury return a verdict in excess of $2 million.

V. COMPETING MOTIONS FOR SUMMARY JUDGMENT

 ERC moved for summary judgment contending that the agreement was unambiguous, that 
the triggering event of any obligation to pay did not occur, and that, therefore, ERC was entitled to
judgment as a matter of law. The Gordons then moved for summary judgment. The Gordons argued
that the agreement could only be interpreted to mean that ERC was obligated to pay $375,000.00
regardless of the amount of the jury's verdict against Good Shepherd. ERC objected to the Gordons'
use of evidence such as documents and deposition testimony from Heygood, Masters, and Doyle.

 In its response to the Gordons' motion, ERC disputed that the Gordons had proven their
claims as a matter of law and brought forward deposition testimony which ERC claims rebutted the
Gordons' evidence and, at a minimum, created genuine issues of material fact. The trial court
granted the Gordons' motion for summary judgment without specifying the grounds on which it
entered summary judgment and expressly denied ERC's motion. 

VI. STANDARD OF REVIEW

 We review de novo a summary judgment and affirm only if the summary judgment record
establishes the movant's right to summary judgment as a matter of law. See Gibbs v. Gen. Motors
Corp., 450 S.W.2d 827, 828 (Tex. 1970). When both parties move for summary judgment, each
party bears the burden of establishing that it is entitled to judgment as a matter of law. See Guynes
v. Galveston County, 861 S.W.2d 861, 862 (Tex. 1993); Ranger Ins. Co. v. Ward, 107 S.W.3d 820,
824 (Tex. App.--Texarkana 2003, pet. denied). When both sides move for summary judgment and
the trial court grants one motion and denies the other, we consider all the evidence accompanying
both motions to determine whether the trial court should have granted either motion and, on finding
error, render the judgment the trial court should have rendered. See Ward, 107 S.W.3d at 824. If
neither movant is entitled to summary judgment, we must remand the case to the trial court. See id.

VII. HIGH-LOW AGREEMENTS AND AMBIGUITY

 A high-low agreement is defined as "[a] settlement in which a defendant agrees to pay the
plaintiff a minimum recovery in return for the plaintiff's agreement to accept a maximum amount
regardless of the outcome of the trial." Black's Law Dictionary 746 (11th ed. 2004).

 A settlement agreement is a contract, and its construction is governed by legal principles
applicable to contracts generally. ASI Techs., Inc. v. Johnson Equip. Co., 75 S.W.3d 545, 547 (Tex.
App.--San Antonio 2002, pet. denied). Whether a contract is ambiguous is a question of law for
this Court to decide, and we do so by looking at the contract as a whole in light of the circumstances
present when the parties entered the contract. See Columbia Gas Transmission Corp. v. New Ulm
Gas Ltd., 940 S.W.2d 587, 589 (Tex. 1996); Friendswood Dev. Co. v. McDade + Co., 926 S.W.2d
280, 282 (Tex. 1996). The agreement is viewed as of the time it was made, not in the light of
subsequent events. See Texas v. Am. Tobacco Co., 463 F.3d 399, 407 (5th Cir. 2006); Ervay, Inc.
v. Wood, 373 S.W.2d 380, 384 (Tex. Civ. App.--Dallas 1963, writ ref'd n.r.e.). If a contract is
worded in such a manner that it can be given a definite or certain legal meaning, then it is not
ambiguous. Nat'l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995).

 A contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably
susceptible to more than one interpretation. See Exxon Corp. v. W. Tex. Gathering Co., 868 S.W.2d
299, 302 (Tex. 1993); Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). We must apply the general
rules of contract interpretation to determine whether the meaning of a contract is uncertain or
whether it is reasonably susceptible to more than one interpretation. See Nguyen Ngoc Giao v. Smith
& Lamm, P.C., 714 S.W.2d 144, 147 (Tex App.--Houston [1st Dist] 1986, no writ).

 An ambiguity in a contract may be either patent or latent; a patent ambiguity is one evident
on the face of the contract. Friendswood Dev. Co., 926 S.W.2d at 282. A latent ambiguity exists
when a contract is unambiguous on its face, but fails by reason of some collateral matter when it is
applied to the subject matter with which it deals. Id. at 282-83; CBI Indus., 907 S.W.2d at 520.

VIII. AT LEAST TWO REASONABLE INTERPRETATIONS

 ERC advances a well-developed grammatical analysis of the provision at issue. To begin,
ERC points out that the word "and" is a coordinating conjunction and, by definition, "joins together
words or word groups of equal grammatical rank." See Merriam-Webster's Collegiate
Dictionary 275 (11th ed. 2006). Therefore, ERC argues that the prepositional phrase "on that
portion of any judgment against Good Shepherd and its nurses in excess of $2 Million" serves to
modify the noun phrase consisting of "$375 Thousand Low" and "$3.5 Million High." ERC
maintains that "a $375 Thousand Low" cannot be read independently from the remainder of the
sentence and, thus, cannot mean that ERC agreed to pay $375,000.00 no matter the verdict.

 However, the Gordons' reading of the provision is also a viable one. They argue that "and"
connects "a $375 Thousand Low" and a "$3.5 Million High on that portion of any judgment against
Good Shepherd and its nurses in excess of $2 Million." The Gordons' position is based on the well-established grammatical rule that a modifier should be placed as close as possible to the word,
phrase, or clause it is intended to modify. 

 What we have here is a classic case of confusion caused by the placement of a modifier. And
we conclude that, as a result of the imprecise structure of the provision, at least two reasonable
readings of provision 1 are possible.

 Because we are called on to examine the agreement as a whole, we add that our examination
of provision 1 in light of the even shorter provision 2 further confuses the issue. Put another way,
the structure of provision 1 permits more than one reasonable interpretation, and provision 2 fails
to lend any clarity or certainty to provision 1. We cannot delineate the rights and obligations of the
involved parties without examining the surrounding circumstances. (3) See Columbia Gas
Transmission Corp., 940 S.W.2d at 591 (In determining the issue of ambiguity, the Texas Supreme
Court examines the "circumstances surrounding the formulation of the contract."). Both the Gordons
and ERC pose reasonable interpretations of provision 1, leading us to conclude the agreement is
patently ambiguous. 

IX. EVIDENCE OF INTENT

 If a contract is determined to be ambiguous, a court may consider the parties' interpretation
of a contract and admit extraneous evidence to determine its meaning. See CBI Indus., Inc., 907
S.W.2d at 520; 4N Int'l, Inc. v. Metro. Transit Auth., 56 S.W.3d 860, 862 (Tex. App.--Houston [1st
Dist.] 2001, pet. denied).

 A. The Gordons' Evidence

 In support of their position that ERC agreed to pay $375,000.00 no matter what, the Gordons
produced the following evidence. The Gordon primarily depend on an e-mail from ERC's claim
representative, Masters, to Good Shepherd sent November 19, 2002, at 11:29 a.m.:

 Brenda-I would again like to urge the Hospital to make a settlement offer on this
case. The contract that you entered into with ERC requires you to cooperate, and to
protect ERC's interest. I have been in contact with the Pltf. Atty. Michael Haygood
to try to negotiate a high low agreement before the verdict returns. As you are aware
ERC has no obligation to drop down to the SIR layer of coverage, however in this
instance, and because Good Shepherd refuses to make an offer, we felt that we need
to not only protect Good Shepherd but also protect our layer from a possible excess
verdict. If Good Shepherd agrees to fund the high/low agreement, ERC will back
away from negotiations. We will not agree to enter into a high/low with our layer,
and then have Good Shepherd enter into one with their SIR. This is really allowing
the Pltf. to prosper because we have not come to an understanding. This is not what
we wish to accomplish. Please contact me at your earliest convenience.

(Emphasis added.) The Gordons rely heavily on the language emphasized to show that ERC did
intend to offer a settlement that was within Good Shepherd's SIR in order to protect itself from
significantly higher damages.

 The Gordons also presented the affidavit of their trial attorney, Heygood, in which he
describes his conversations with Doyle and Masters regarding the benefits of having a guaranteed
recovery and recoupment of the firm's expenses. He emphasized that Doyle "specifically told [him]
that, as part of the settlement, ERC would pay April and Ronnie Gordon at least Three Hundred
Seventy-Five Thousand Dollars ($375,000) no matter what the judgment turned out to be." He
explained that Masters told him the same. 

 The Gordons also presented Doyle's deposition. Doyle testified that he began conversations
with Heygood very early on in the Good Shepherd litigation, but does not recall the specifics of any
negotiations with him other than that the two may have discussed the possible outcome of the case. 
In fact, Doyle testified that he does not recall much of anything having to do with the negotiations. 
Specifically, he could not recall any conversation in which he and Heygood arrived at an agreement. 
Although Doyle's testimony is riddled with his failures to recall most everything related to the
underlying negotiations, he does specifically recall that his intent in drafting the agreement was that
the Gordons would only benefit under the agreement if the jury verdict was between $2,000,000.00
and $2,375,000.00. He insisted that the agreement speaks for itself. However, when asked the
particular business activity sought to be served by the agreement, Doyle explained, "I think they were
just trying to get some money when possibly they wouldn't have received any money." This
testimony does suggest the agreement was a way of guaranteeing at least some recovery and covering
the significant litigation expenses in case the Gordons lost.

 Masters also testified to her inability to recall much of any conversation relating to the
agreement. However, she does deny that she ever told Heygood that the Gordons should take the
deal since they would get $375,000.00 no matter what. Masters also denied ever even suggesting
or considering that ERC "drop down into the SIR amount." She explained that ERC has never done
so. (4) She testified that this agreement was a high-low agreement in ERC's layer and that ERC's layer
began at $2,000,001.00. She did agree she evaluated a likely verdict range of $8 million to $12
million. She explained the emphasized language in her e-mail message: "'However' referred to the
fact that I was still going to enter into a high/low agreement above the SIR." She seemed to say that
her message was to explain to Good Shepherd that ERC had no obligation to drop down into the SIR
and that ERC was going to offer to settle the case anyway in its own layer.

 B. ERC's Evidence

 In its response to the Gordons' motion for summary judgment, ERC presented the deposition
of Cooper, a partner in the firm in which Doyle was employed and to whom Doyle reported. Cooper
testified that he received daily reports on the Good Shepherd litigation from either Doyle or Masters. 
He testified that he and Doyle discussed the goal of the high-low agreement as a means of limiting
ERC's exposure in the event of a judgment greater than $2,000,000.00. He, like Doyle, often insisted
that the agreement speaks for itself. Although Cooper admitted he knew ERC's intent in entering
the agreement, he refused, on the basis of attorney-client privilege, to discuss ERC's intent. He did
explain his interpretation of the agreement. "If the judgment was 2 million 375 down to 2 million,
the Gordons would benefit from this agreement. If the judgment was 2 million 375 and above, ERC
would benefit from the agreement." 

X. CONCLUSION

 An issue is conclusively established when the evidence is such that there is no room for
ordinary minds to differ as to the conclusion to be drawn from it. Triton Oil & Gas Corp. v. Marine
Contractors & Supply, Inc., 644 S.W.2d 443, 446 (Tex. 1982). Therefore, for us to conclude that
the Gordons were entitled to judgment as a matter of law, we must conclude that the evidence
presented conclusively proved that the parties intended to enter into an agreement in which ERC
would pay $375,000.00 to the Gordons no matter the amount of the jury's verdict against Good
Shepherd. The message from Masters regarding ERC's decision to make a high-low offer even
though ERC had no obligation to "drop down" to Good Shepherd's level of coverage presents some
evidence of ERC's intention to settle within Good Shepherd's SIR. The Gordons also presented
evidence from Heygood that ERC intended to pay $375,000.00 no matter the jury verdict. Doyle's
testimony also suggests that such was the Gordons' intent, to guarantee some recovery when they
might not get any recovery. 

 To rebut such evidence, ERC presented Cooper's testimony, which specifically did not
address ERC's intent, but did offer Cooper's interpretation of the agreement. The Gordons' evidence
also included Doyle's testimony regarding his intent in drafting the agreement that the Gordons only
benefit under the agreement if the jury award fell between $2,000,000.00 and $2,375,000.00. Aside
from Cooper's interpretation, much of ERC's evidence in response takes the form of an insistence
that the agreement speaks for itself. As far as ERC's intent goes, Doyle could not remember much
of anything relating to negotiations, and Cooper, while he knew ERC's intent in the agreement,
refused to testify on that particular matter on the ground of attorney-client privilege. 

 While the evidence provides support for the Gordons' position, the evidence fails to
conclusively prove that position. Doyle's testimony regarding his intent; Cooper's interpretation of
the agreement; and testimony from Masters that, despite the language in her e-mail, ERC did not
intend to settle within Good Shepherd's SIR create a genuine issue of material fact regarding the
parties' intent such that resolution of the factual issues more properly belongs to the finder of fact. 

 Accordingly, we reverse the trial court's summary judgment and remand the case for further
proceedings.



 Jack Carter

 Justice


Date Submitted: November 30, 2006

Date Decided: December 19, 2006

1. ERC retained R. Brent Cooper, who was assisted by Doyle. Doyle was not yet licensed to
practice law; Doyle drafted the high-low settlement agreement here.
2. The Gordons explain that the reason for the significantly lower jury verdict returned against
Good Shepherd is the fact that the jury assigned more of the liability to a codefendant physician than
it attributed to Good Shepherd.
3. We note that we are permitted to look somewhat beyond the simple grammar of the
agreement and must decide whether there is an ambiguity by looking at the contract as a whole in
light of the circumstances present when the parties entered the contract. Although not necessary here
since the provision presents a patent ambiguity, we do add that the circumstances in which the
parties entered the agreement also lend uncertainty to the meaning of the provision.

 In light of the generally accepted purpose of a high-low settlement, and since it appeared that
the Gordons were very likely to get a multimillion dollar judgment against Good Shepherd, and that,
as a result, ERC would likely have to pay under its contract with Good Shepherd, the fact that ERC
would decide to offer a settlement within the amount for which the nonsettling Good Shepherd
would be responsible is not as preposterous as ERC maintains. In fact, it seems offering
$375,000.00 in light of the risk of paying several million is quite reasonable even though ERC would
not otherwise be responsible for any amount under $2 million.

 Likewise, a question arises as to the likelihood of the Gordons entering into such a limited
agreement as ERC now proposes. That is, under ERC's interpretation, the Gordons would only
benefit under the agreement if the jury returned a verdict between $2,000,000,00 and $2,375,000.00. 
Further, common sense tells us that the Gordons would not likely be as concerned with ensuring the
recovery of a low amount of $375,000.00 if they already had a judgment over $2 million, at least not
so much so that they would agree to such a drastic limitation on ERC's potential liability.
4. In this vein, ERC argues it would not have been liable for any amount under $2 million
under the terms of their agreement with Good Shepherd. Therefore, it contends, it is unreasonable,
almost absurd, to interpret the agreement in such a way as to obligate ERC for any amount under $2
million. To that argument, we point out that it is not unheard of for a party to a high-low settlement
to relinquish a right it might ordinarily be able to exercise in order to enjoy the protection that a high-low settlement might offer in the context of an uncertain jury verdict. As an example, we look to
ASI Technologies. 

 The court in ASI concluded that, by entering into a high-low settlement agreement with the
plaintiff and the subsequent verdict-sharing settlement agreement with ASI, Johnson chose to forego
the possibility that the jury might find it an innocent seller, choosing instead to protect itself by
agreeing to pay a predetermined sum to the plaintiff regardless of the jury's finding as to its liability. 
See ASI Techs., 75 S.W.3d at 548-49. Allowing Johnson Equipment to later assert its previous right
to statutory indemnity would render the verdict-sharing settlement agreement with ASI meaningless. 
See id. at 548. Because Johnson Equipment's trial counsel drafted the agreement, the court of
appeals strictly construed the agreement against Johnson Equipment. See id. Johnson Equipment
could have easily included a provision in which it reserved its right to statutory indemnity, but did
not do so. See id.; see also Lumbermens Mut. Cas. Co. v. Carter, 934 S.W.2d 912, 914 (Tex.
App.--Beaumont 1996, no writ).


ENDANT]: I object to hearsay, Your Honor.


COURT: Overruled.


A: The two boys were interviewed separately and almost in an embarrassed, a
giggly manner when Mr. Josey lifted [the victim] up over him, [the victim's]
boxer shorts came down and [the victim] talked about that. And then [the
victim's stepbrother], whenever he was being interviewed, kind of giggled,
embarrassed, and said they dropped all the way to his knees. That for some
reason just stuck out in my mind, as well as whenever [Langston]
interview[ed] [the victim] and he explained that, yes, he was to stick his
finger in Mr. Josey's rectum, that [the victim] says, no, I had to stick two.


Q: So [the victim] is describing where his boxers fell off?


A: Right.


Q: And then [the victim's stepbrother] in a separate interview without [the
victim] in the room, it's just [the victim's stepbrother], and he described the
incident where [the victim's] boxers fell off?


A: Exactly.


(Emphasis added.) 

 Hearsay is "a statement, other than one made by the declarant while testifying at the trial or
hearing, offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d); see also
Long, 800 S.W.2d at 547. Unless it falls within an exception created by statute or rule, hearsay is
inadmissible. Tex. R. Evid. 802. Contrary to the State's suggestion, Rule-Graham's highlighted
testimony is not merely limited to her observations of the victim's demeanor; it also includes the
victim's out-of-court statement. The lower court's pretrial ruling makes clear that Rule-Graham was
not identified as an outcry witness in this case. There is no indication the statement falls within any
exception to the hearsay rule. Therefore, the statement is hearsay, and the trial court erred by
admitting the statement into evidence. See Long, 800 S.W.2d at 548. This conclusion, however,
does not end our review; we must analyze the error for harm. Tex. R. App. P. 44.2.

 The admission of hearsay over proper objection, though error, is nonconstitutional error. 
Broderick v. State, 35 S.W.3d 67, 74 (Tex. App.-Texarkana 2000, pet. ref'd). The reviewing court
must deem the error harmless if, after reviewing the entire record, the court is reasonably assured 
the error did not influence the jury's verdict or had but a slight effect. Id.; Tex. R. App. P. 44.2(b). 
If the same or similar evidence is admitted without objection at another point during the trial,
improper admission of the evidence will not constitute reversible error. Broderick, 35 S.W.3d at 74.

 Rule-Graham testified to statements the victim made during his interview with Langston,
even though she was not designated as an outcry witness and her testimony falls within none of the
exceptions to the hearsay rule. However, a videotape of the victim's interview was admitted into
evidence and played to the jury. The videotape contained the same victim statements to which Rule-Graham had earlier testified. Josey did not object to the videotape or to playing its contents before
the jury. Where testimony is admitted over objection, and the same testimony or testimony to the
same effect is thereafter admitted without objection, the objection in the first instance is waived. 
Davis v. State, 516 S.W.2d 157, 162 (Tex. Crim. App. 1974); Beheler v. State, 3 S.W.3d 182, 187
(Tex. App.-Fort Worth 1999, pet. ref'd). Such is the case here. By failing to object to the testimony
contained in the videotape, Josey waived his objection to Rule-Graham's inadmissible hearsay
testimony regarding the victim's outcry. Additionally, we cannot say after examining the record as
a whole that Rule-Graham's hearsay testimony had an effect on Josey's substantial rights or
improperly influenced the jury, because that testimony was very brief and the jury had an opportunity
to watch the interview for itself. See Tex. R. App. P. 44.2(b); Broderick, 35 S.W.3d at 74 (improper
admission of hearsay is nonconstitutional error reviewed under Rule 44.2(b)). The error, even had
it been preserved, would have been harmless. We overrule Josey's final point of error.

 The judgment of the trial court is affirmed.


 Josh R. Morriss, III

 Chief Justice

Date Submitted: October 10, 2002

Date Decided: January 8, 2003


Publish
1. Josey was charged with aggravated sexual assault in three separate cases involving two
different victims. The jury heard all three cases simultaneously, convicting Josey in two and
acquitting him in one. The indictment in this case alleged the aggravated sexual assault of a child
under the age of fourteen years by digital penetration. See Tex. Pen. Code Ann. § 22.021(a)(1)(B)
(Vernon Supp. 2003). Josey's other conviction is for oral contact with the same victim and is also
before this Court in a separate appeal styled Josey v. State, No. 06-02-00024-CR.
2. There is nothing in the record to suggest Josey was charged, tried, or convicted for sexual
performance of a child. See Tex. Pen. Code Ann. § 43.25 (Vernon Supp. 2003).