**EMPLOYERS REINSURANCE CORPORATION, Appellant,**

v.

**April GORDON, Individually, and as Next Friend of Dakota Gordon, and Ronnie Gordon, Appellees.**

**No. 06–06–00028–CV.**

Court of Appeals of Texas, Texarkana.

Submitted Nov. 30, 2006.

Decided Dec. 19, 2006.

Jeffery C. Lewis, Atchley, Russell, Waldrop & Hlavinka, LLP, Texarkana, for appellant.

James Craig Orr, Jr., Heygood, Orr, Reyes & Bartolomei, Irving, for appellees.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice CARTER.

This is an appeal from a summary judgment entered in favor of April Gordon, Individually, and as Next Friend of Dakota Gordon, and Ronnie Gordon (collectively the Gordons). At issue is the interpretation of a short, seemingly simple provision of a high-low settlement agreement entered into by the Gordons and Employers Reinsurance Corporation (ERC). We reverse and remand.

## I. BACKGROUND AND ROLES OF THE PARTIES

In 1999, April and Ronnie Gordon sued Good Shepherd Medical Center alleging negligence in connection with a brain injury sustained by their daughter. The jury heard evidence that the life care for the daughter would range from $4.6 million to $9.2 million. Good Shepherd had a self-insured retention (SIR) in the amount of $2 million, and ERC provided excess insurance coverage for Good Shepherd for any

liability in excess of $2 million, up to $30 million.

During the litigation, ERC's claim consultant, Debra Crawford Masters, recommended Good Shepherd settle the case since it appeared quite possible that a judgment could exceed even the excess insurance coverage. ERC's correspondence with Good Shepherd indicated that ERC feared a very large verdict. However, Good Shepherd did not offer to settle. In an e-mail, Masters advised Good Shepherd of ERC's concerns regarding the possibility of a very large verdict and informed Good Shepherd that ERC would attempt to negotiate a high-low settlement with the Gordons, urging that such action would protect both ERC and Good Shepherd from excess exposure.

While the jury was deliberating the Gordons' case against Good Shepherd, James Doyle, cocounsel for ERC,[1] began negotiations with the Gordons' attorney, Michael Heygood, partner to the Gordons' appellate counsel. Doyle drafted a proposed settlement agreement. After Doyle made the changes Heygood wanted in the agreement, the two signed the handwritten settlement agreement. The parties refer to this agreement as a high-low settlement agreement.

## II. PROVISION AT ISSUE

The one-page, handwritten settlement agreement provides, in pertinent part, the following:

Parties agree:

1. TO A *$375 THOUSAND* LOW AND A *$3.5 MILLION* HIGH ON THAT PORTION OF ANY JUDGMENT AGAINST GOOD SHEPHERD AND ITS NURSES IN EXCESS OF *$2*

---

1. ERC retained R. Brent Cooper, who was assisted by Doyle. Doyle was not yet licensed to practice law; Doyle drafted the high-low settlement agreement here.

*MILLION*, AFTER ALL APPEALS ARE EXHAUSTED.

2. THAT IF HOSPITAL OR ITS NURSES SETTLE WITH PLAINTIFFS BEFORE JUDGMENT EITHER PARTY HAS RIGHT [SIC] TO VOID AGREEMENT.

3. BOTH SIDES RESERVE THE RIGHT TO APPEAL.

The parties disagree as to the meaning of provision 1.

## III. THE JURY VERDICT IN UNDERLYING SUIT AND SUBSEQUENT LITIGATION

The jury did, in fact, return a verdict in favor of the Gordons, but the amount of the verdict against Good Shepherd was surprisingly less than it appears all parties had anticipated, amounting to $562,000.00.[2] The Gordons sought to recover from ERC $375,000.00 pursuant to the agreement.

## IV. COMPETING INTERPRETATIONS

ERC argues that provision 1 unambiguously provides that ERC will pay one of the following two amounts:

a $375,000.00 low on that portion of any judgment against Good Shepherd in excess of $2 million

OR

a $3.5 million high on that portion of any judgment against Good Shepherd in excess of $2 million.

ERC advances the interpretation that only a verdict exceeding $2 million against Good Shepherd would trigger *any* obligation to pay *any* amount under the agreement. Therefore, since the jury verdict was less than $2 million, ERC claims to

owe nothing to the Gordons under this high-low agreement.

According to the Gordons, provision 1 unambiguously provides that ERC will pay one of these two amounts:

a $375,000.00 low

OR

a $3.5 million high on that portion of any judgment against Good Shepherd and its nurses in excess of $2 million.

The Gordons argue that the agreement is unambiguous and means that ERC is obligated to pay the $375,000.00 low *no matter what.* According to their interpretation, only the high figure is connected to the condition that the jury return a verdict in excess of $2 million.

## V. COMPETING MOTIONS FOR SUMMARY JUDGMENT

ERC moved for summary judgment contending that the agreement was unambiguous, that the triggering event of any obligation to pay did not occur, and that, therefore, ERC was entitled to judgment as a matter of law. The Gordons then moved for summary judgment. The Gordons argued that the agreement could only be interpreted to mean that ERC was obligated to pay $375,000.00 regardless of the amount of the jury's verdict against Good Shepherd. ERC objected to the Gordons' use of evidence such as documents and deposition testimony from Heygood, Masters, and Doyle.

In its response to the Gordons' motion, ERC disputed that the Gordons had proven their claims as a matter of law and brought forward deposition testimony which ERC claims rebutted the Gordons' evidence and, at a minimum, created genuine issues of material fact. The trial court

---

**2.** The Gordons explain that the reason for the significantly lower jury verdict returned against Good Shepherd is the fact that the jury assigned more of the liability to a codefendant physician than it attributed to Good Shepherd.

granted the Gordons' motion for summary judgment without specifying the grounds on which it entered summary judgment and expressly denied ERC's motion.

## VI.  STANDARD OF REVIEW

We review de novo a summary judgment and affirm only if the summary judgment record establishes the movant's right to summary judgment as a matter of law. *See Gibbs v. Gen. Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970).  When both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *See Guynes v. Galveston County*, 861 S.W.2d 861, 862 (Tex.1993); *Ranger Ins. Co. v. Ward*, 107 S.W.3d 820, 824 (Tex. App.-Texarkana 2003, pet. denied).  When both sides move for summary judgment and the trial court grants one motion and denies the other, we consider all the evidence accompanying both motions to determine whether the trial court should have granted either motion and, on finding error, render the judgment the trial court should have rendered. *See Ward*, 107 S.W.3d at 824.  If neither movant is entitled to summary judgment, we must remand the case to the trial court. *See id.*

## VII.  HIGH–LOW  AGREEMENTS AND AMBIGUITY

A high-low agreement is defined as "[a] settlement in which a defendant agrees to pay the plaintiff a minimum recovery in return for the plaintiff's agreement to accept a maximum amount regardless of the outcome of the trial." Black's Law Dictionary 746 (11th ed.2004).

A settlement agreement is a contract, and its construction is governed by legal principles applicable to contracts generally. *ASI Techs., Inc. v. Johnson Equip. Co.*, 75 S.W.3d 545, 547 (Tex.App.-San Antonio 2002, pet. denied).  Whether a con-

tract is ambiguous is a question of law for this Court to decide, and we do so by looking at the contract as a whole in light of the circumstances present when the parties entered the contract. *See Columbia Gas Transmission Corp. v. New Ulm Gas Ltd.*, 940 S.W.2d 587, 589 (Tex.1996); *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex.1996).  The agreement is viewed as of the time it was made, not in the light of subsequent events. *See Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir.2006); *Ervay, Inc. v. Wood*, 373 S.W.2d 380, 384 (Tex.Civ. App.-Dallas 1963, writ ref'd n.r.e.).  If a contract is worded in such a manner that it can be given a definite or certain legal meaning, then it is not ambiguous. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995).

A contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one interpretation. *See Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 302 (Tex.1993); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983).  We must apply the general rules of contract interpretation to determine whether the meaning of a contract is uncertain or whether it is reasonably susceptible to more than one interpretation. *See Nguyen Ngoc Giao v. Smith & Lamm, P.C.*, 714 S.W.2d 144, 147 (Tex App.-Houston [1st Dist] 1986, no writ).

An ambiguity in a contract may be either patent or latent; a patent ambiguity is one evident on the face of the contract. *Friendswood Dev. Co.*, 926 S.W.2d at 282.  A latent ambiguity exists when a contract is unambiguous on its face, but fails by reason of some collateral matter when it is applied to the subject matter with which it deals. *Id.* at 282–83; *CBI Indus.*, 907 S.W.2d at 520.

## VIII. AT LEAST TWO REASONABLE INTERPRETATIONS

ERC advances a well-developed grammatical analysis of the provision at issue. To begin, ERC points out that the word "and" is a coordinating conjunction and, by definition, "joins together words or word groups of equal grammatical rank." *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 275 (11th ed.2006). Therefore, ERC argues that the prepositional phrase "on that portion of any judgment against Good Shepherd and its nurses in excess of $2 Million" serves to modify the noun phrase consisting of "$375 Thousand Low" and "$3.5 Million High." ERC maintains that "a $375 Thousand Low" cannot be read independently from the remainder of the sentence and, thus, cannot mean that ERC agreed to pay $375,000.00 no matter the verdict.

However, the Gordons' reading of the provision is also a viable one. They argue that "and" connects "a $375 Thousand Low" and a "$3.5 Million High on that portion of any judgment against Good Shepherd and its nurses in excess of $2 Million." The Gordons' position is based on the well-established grammatical rule that a modifier should be placed as close as possible to the word, phrase, or clause it is intended to modify.

What we have here is a classic case of confusion caused by the placement of a modifier. And we conclude that, as a result of the imprecise structure of the provision, at least two reasonable readings of provision 1 are possible.

Because we are called on to examine the agreement as a whole, we add that our examination of provision 1 in light of the even shorter provision 2 further confuses the issue. Put another way, the structure of provision 1 permits more than one reasonable interpretation, and provision 2 fails to lend any clarity or certainty to provision 1. We cannot delineate the rights and obligations of the involved parties without examining the surrounding circumstances.[3] *See Columbia Gas Transmission Corp.,* 940 S.W.2d at 591 (In determining the issue of ambiguity, the Texas Supreme Court examines the "circumstances surrounding the formulation of the contract."). Both the Gordons and ERC pose reasonable interpretations of provision 1, leading us to conclude the agreement is patently ambiguous.

---

**3.** We note that we are permitted to look somewhat beyond the simple grammar of the agreement and must decide whether there is an ambiguity by looking at the contract as a whole in light of the circumstances present when the parties entered the contract. Although not necessary here since the provision presents a patent ambiguity, we do add that the circumstances in which the parties entered the agreement also lend uncertainty to the meaning of the provision.

In light of the generally accepted purpose of a high-low settlement, and since it appeared that the Gordons were very likely to get a multimillion dollar judgment against Good Shepherd, and that, as a result, ERC would likely have to pay under its contract with Good Shepherd, the fact that ERC would decide to offer a settlement within the amount for which the nonsettling Good Shepherd would be responsible is not as preposterous as ERC maintains. In fact, it seems offering $375,000.00 in light of the risk of paying several million is quite reasonable even though ERC would not otherwise be responsible for any amount under $2 million.

Likewise, a question arises as to the likelihood of the Gordons entering into such a limited agreement as ERC now proposes. That is, under ERC's interpretation, the Gordons would only benefit under the agreement if the jury returned a verdict between $2,000,000.00 and $2,375,000.00. Further, common sense tells us that the Gordons would not likely be as concerned with ensuring the recovery of a low amount of $375,000.00 if they already had a judgment over $2 million, at least not so much so that they would agree to such a drastic limitation on ERC's potential liability.

## IX. EVIDENCE OF INTENT

If a contract is determined to be ambiguous, a court may consider the parties' interpretation of a contract and admit extraneous evidence to determine its meaning. *See CBI Indus., Inc.,* 907 S.W.2d at 520; *4N Int'l, Inc. v. Metro. Transit Auth.,* 56 S.W.3d 860, 862 (Tex. App.-Houston [1st Dist.] 2001, pet. denied).

### A. The Gordons' Evidence

In support of their position that ERC agreed to pay $375,000.00 no matter what, the Gordons produced the following evidence. The Gordon primarily depend on an e-mail from ERC's claim representative, Masters, to Good Shepherd sent November 19, 2002, at 11:29 a.m.:

> Brenda–I would again like to urge the Hospital to make a settlement offer on this case. The contract that you entered into with ERC requires you to cooperate, and to protect ERC's interest. I have been in contact with the Pltf. Atty. Michael Haygood to try to negotiate a high low agreement before the verdict returns. *As you are aware ERC has no obligation to drop down to the SIR layer of coverage, however in this instance, and because Good Shepherd refuses to make an offer, we felt that we need to not only protect Good Shepherd but also protect our layer from a possible excess verdict.* If Good Shepherd agrees to fund the high/low agreement, ERC will back away from negotiations. We will not agree to enter into a high/low with our layer, and then have Good Shepherd enter into one with their SIR. This is really allowing the Pltf. to prosper because we have not come to an understanding. This is not what we wish to accomplish. Please contact me at your earliest convenience.

(Emphasis added.) The Gordons rely heavily on the language emphasized to show that ERC did intend to offer a settlement that was within Good Shepherd's SIR in order to protect itself from significantly higher damages.

The Gordons also presented the affidavit of their trial attorney, Heygood, in which he describes his conversations with Doyle and Masters regarding the benefits of having a guaranteed recovery and recoupment of the firm's expenses. He emphasized that Doyle "specifically told [him] that, as part of the settlement, ERC would pay April and Ronnie Gordon at least Three Hundred Seventy–Five Thousand Dollars ($375,000) no matter what the judgment turned out to be." He explained that Masters told him the same.

The Gordons also presented Doyle's deposition. Doyle testified that he began conversations with Heygood very early on in the Good Shepherd litigation, but does not recall the specifics of any negotiations with him other than that the two may have discussed the possible outcome of the case. In fact, Doyle testified that he does not recall much of anything having to do with the negotiations. Specifically, he could not recall any conversation in which he and Heygood arrived at an agreement. Although Doyle's testimony is riddled with his failures to recall most everything related to the underlying negotiations, he does specifically recall that *his* intent in drafting the agreement was that the Gordons would only benefit under the agreement if the jury verdict was between $2,000,000.00 and $2,375,000.00. He insisted that the agreement speaks for itself. However, when asked the particular business activity sought to be served by the agreement, Doyle explained, "I think they were just trying to get some money when possibly they wouldn't have received any money." This testimony does suggest the agreement was a way of guaranteeing at least some recovery and covering the significant

litigation expenses in case the Gordons lost.

Masters also testified to her inability to recall much of any conversation relating to the agreement. However, she does deny that she ever told Heygood that the Gordons should take the deal since they would get $375,000.00 no matter what. Masters also denied ever even suggesting or considering that ERC "drop down into the SIR amount." She explained that ERC has never done so.[4] She testified that this agreement was a high-low agreement in ERC's layer and that ERC's layer began at $2,000,001.00. She did agree she evaluated a likely verdict range of $8 million to $12 million. She explained the emphasized language in her e-mail message: " 'However' referred to the fact that I was still going to enter into a high/low agreement above the SIR." She seemed to say that her message was to explain to Good Shepherd that ERC had no obligation to drop down into the SIR and that ERC was going to offer to settle the case anyway in its own layer.

### B. ERC's Evidence

In its response to the Gordons' motion for summary judgment, ERC presented the deposition of Cooper, a partner in the firm in which Doyle was employed and to whom Doyle reported. Cooper testified that he received daily reports on the Good Shepherd litigation from either Doyle or Masters. He testified that he and Doyle discussed the goal of the high-low agreement as a means of limiting ERC's exposure in the event of a judgment greater than $2,000,000.00. He, like Doyle, often insisted that the agreement speaks for itself. Although Cooper admitted he knew ERC's intent in entering the agreement, he refused, on the basis of attorney-client privilege, to discuss ERC's intent. He did explain his interpretation of the agreement. "If the judgment was 2 million 375 down to 2 million, the Gordons would benefit from this agreement. If the judgment was 2 million 375 and above, ERC would benefit from the agreement."

### X. CONCLUSION

■ An issue is conclusively established when the evidence is such that there is no room for ordinary minds to differ as to the conclusion to be drawn from it. *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex.1982). Therefore, for us to conclude that the Gordons were entitled to

---

4. In this vein, ERC argues it would not have been liable for any amount under $2 million under the terms of their agreement with Good Shepherd. Therefore, it contends, it is unreasonable, almost absurd, to interpret the agreement in such a way as to obligate ERC for any amount under $2 million. To that argument, we point out that it is not unheard of for a party to a high-low settlement to relinquish a right it might ordinarily be able to exercise in order to enjoy the protection that a high-low settlement might offer in the context of an uncertain jury verdict. As an example, we look to *ASI Technologies*.

The court in *ASI* concluded that, by entering into a high-low settlement agreement with the plaintiff and the subsequent verdict-sharing settlement agreement with ASI, Johnson chose to forego the possibility that the jury might find it an innocent seller, choosing instead to protect itself by agreeing to pay a predetermined sum to the plaintiff regardless of the jury's finding as to its liability. *See ASI Techs.*, 75 S.W.3d at 548–49. Allowing Johnson Equipment to later assert its previous right to statutory indemnity would render the verdict-sharing settlement agreement with ASI meaningless. *See id.* at 548. Because Johnson Equipment's trial counsel drafted the agreement, the court of appeals strictly construed the agreement against Johnson Equipment. *See id.* Johnson Equipment could have easily included a provision in which it reserved its right to statutory indemnity, but did not do so. *See id.; see also Lumbermens Mut. Cas. Co. v. Carter*, 934 S.W.2d 912, 914 (Tex.App.-Beaumont 1996, no writ).

judgment as a matter of law, we must conclude that the evidence presented conclusively proved that the parties intended to enter into an agreement in which ERC would pay $375,000.00 to the Gordons no matter the amount of the jury's verdict against Good Shepherd. The message from Masters regarding ERC's decision to make a high-low offer even though ERC had no obligation to "drop down" to Good Shepherd's level of coverage presents some evidence of ERC's intention to settle within Good Shepherd's SIR. The Gordons also presented evidence from Heygood that ERC intended to pay $375,000.00 no matter the jury verdict. Doyle's testimony also suggests that such was the Gordons' intent, to guarantee some recovery when they might not get any recovery.

To rebut such evidence, ERC presented Cooper's testimony, which specifically did not address ERC's intent, but did offer Cooper's interpretation of the agreement. The Gordons' evidence also included Doyle's testimony regarding *his* intent in drafting the agreement that the Gordons only benefit under the agreement if the jury award fell between $2,000,000.00 and $2,375,000.00. Aside from Cooper's interpretation, much of ERC's evidence in response takes the form of an insistence that the agreement speaks for itself. As far as ERC's intent goes, Doyle could not remember much of anything relating to negotiations, and Cooper, while he knew ERC's intent in the agreement, refused to testify on that particular matter on the ground of attorney-client privilege.

While the evidence provides support for the Gordons' position, the evidence fails to conclusively prove that position. Doyle's testimony regarding his intent; Cooper's interpretation of the agreement; and testimony from Masters that, despite the language in her e-mail, ERC did not intend to settle within Good Shepherd's SIR create a genuine issue of material fact regarding the parties' intent such that resolution of the factual issues more properly belongs to the finder of fact.

Accordingly, we reverse the trial court's summary judgment and remand the case for further proceedings.