REVISED MARCH 8, 2010
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 8, 2010

Charles R. Fulbruge III
Clerk

No. 09-20155

ADDICKS SERVICES, INC.,

Plaintiff - Appellant

v.

GGP-BRIDGELAND, LP, formerly known as Rouse-Houston, LP;
BRIDGELAND GP, LLC; SAFECO INSURANCE COMPANY OF AMERICA,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before KING, GARZA, and HAYNES, Circuit Judges.

KING, Circuit Judge:

In this contract action, plaintiff–appellant is a contractor seeking damages for extra work and delay costs incurred performing land improvement for a residential development in Harris County, Texas. The district court granted summary judgment to defendants–appellees, holding that plaintiff–appellant's claims were barred by waivers and releases it executed monthly to receive progress payments. We affirm.

## I. BACKGROUND

GGP-Bridgeland, LP ("Bridgeland")[1] is the owner of Bridgeland, a residential development in Harris County, Texas. Addicks Services, Inc. ("Addicks"), submitted a bid to perform excavation and grading work on the approximately 500-acre site. On July 20, 2004, Addicks and Bridgeland executed a Standard Form of Agreement Between Owner and Contractor (the "Contract"). Addicks's role was to perform "cut and fill" services, which involve excavating or "cutting" the land on the site to create lakes and other scenic features. The excavated dirt or "spoil" produced from the excavation would then be spread or "filled" across the development to create a uniform elevation. Under the original terms of the Contract, Addicks was required to cut and fill slightly more than 2 million cubic yards of dirt in 150 calendar days; it would receive $4,582,721.79 for this service.

The parties contemplated that the Contract would consist of multiple documents. The Contract defines "Work" as "the work described in the Drawings and Specifications . . . and any requirements set forth in any other Contract Documents enumerated in Article XIX." (Contract ¶ 1.1.) Article XIX is labeled "Integration Clause" and consists of two provisions. The first provides that the Contract, together with its attached exhibits and documents incorporated by reference, is the entire agreement and supersedes prior negotiations, representations, and agreements. (Contract ¶ 19.1.) It further contained a no-oral-modification clause stating that the Contract could be amended or modified only in written change order forms signed by both Addicks and Bridgeland. (Id.) The second provision enumerated the documents constituting the Contract.[2]

---

[1] Bridgeland GP, LLC, is the general partner of GGP-Bridgeland, LP. GGP-Bridgeland, LP, secured a Release of Lien Bond from Safeco Insurance Company of America, so that it would be able to sell residential units within the Bridgeland development free and clear of any liens. Unless otherwise specified, we refer to Appellees collectively as "Bridgeland."

[2] Those documents listed were:
a) This Agreement and Special Conditions of Agreement;

(Contract ¶ 19.2.)

Two articles in the Contract dealt specifically with changes and modifications to the work Addicks was to perform under the Contract. Addicks was required to notify Bridgeland of any "claim[] for additional compensation, extra work, delay, extensions of time, or loss, injury or damages" within ten days of its occurrence. (Contract ¶ 10.1.) Addicks was then required to submit a detailed claim within thirty days and to submit a change order proposal on request of Bridgeland. (Contract ¶ 10.2.) Addicks agreed to perform changes and modifications to the scope of work under the Contract that were requested by Bridgeland in writing; payment for such changes was governed by the Contract's schedule or by the cost plus a 5% markup. (Contract ¶ 12.1.) If the parties disagreed over a particular change, Addicks was required to proceed with the modification and prepare a change order proposal, which was "subject to full audit, review and approval by [Bridgeland]." (Id.)

Article VIII of the Contract governed payment to Addicks. The Contract specified that Addicks would perform the requested work for $4,582,721.79 (Contract ¶ 8.1), but it also provided for monthly progress payments (Contract ¶ 8.2). To receive a progress payment, the Contract contemplated that Addicks would submit a written application detailing the work performed to date; the application would be accompanied by an executed lien waiver that would release

---

b) Exhibits to this Agreement;
c) Performance, Payment, and other Bonds identified;
d) Invitation to Bidders;
e) Instructions to Bidders;
f) Notice to Proceed;
g) Standard and Special Specifications;
h) Construction Drawings;
i) Storm Water Pollution Prevention Plan[;]
j) Addenda;
k) All Change Orders and written modifications that amend or supplement the Contract Documents pursuant to the Contract Documents;
l) All documents incorporated by reference into the Contract Documents.
(Contract ¶ 19.2.)

Addicks's mechanic's and materialman's lien on the project. (Id.) Blank lien waiver forms were attached to the Contract. The relevant form was entitled "Waiver and Release of Lien upon Progress Payment" (the "Interim Waiver"), and provides, in relevant part:

> [Addicks], in consideration of the sum of $_____, hereby waives and releases its lien and right to claim a lien for labor, services, or materials furnished through _____ (date of this waiver) under contract with _____ on the job of _____ (Owner) to the following property: _____ (Name and Address of Project). This waiver and release does not cover any retention or labor, services or materials furnished after the date specified.

> Any and all . . . subcontractors . . . have been paid and satisfied in full, and there are no outstanding claims of any character arising out of, or related to, the undersigned's activities on, or improvements to, the Project.

> This Waiver constitutes a representation by [Addicks] that the payment referenced above, once received, constitutes full and complete payment for all work[3] performed, and all costs or expenses incurred (including, but not limited to, costs for supervision, field office overhead, home office overhead, interest on capital, profit, and general conditions costs) relative to the work or improvements at the Project as of the date of this Waiver, except for the payment of retainage. [Addicks] specifically waives, quitclaims and releases any claim for damages due to delay, hindrance, interference, acceleration, inefficiencies or extra work, or any other claim of any kind it may have . . . as of the date of this Waiver, except as follows: _____.

> This Waiver is specifically made for the benefit of [Bridgeland]. The amount of money set forth as due and owing in the immediately preceding Waiver dated _____, 20__, has been received, and is deemed paid in full.

---

[3] Addicks argues that it is unclear whether the word "work" in the Interim Waiver form refers to the term "Work" defined by paragraph 1.1 of the Contract. We address this contention below.

(Contract Ex. E.)[4]

Addicks received notice to proceed with the project in August 2004. Addicks claims that, subsequent to commencing work, a number of factors hindered its timely performance, including Bridgeland's requests for additional work, inclement weather, and site accessibility problems. Pursuant to the mechanisms in the Contract, Addicks made numerous requests for information regarding work, for extension of time, and for change orders to reflect the additional work performed and to adjust the price of the Contract accordingly. In some of the change order requests, Addicks included the following language: "This modification constitutes compensation in full on behalf of [Addicks] for direct costs only which are attributable to the changes ordered herein. [Addicks] [r]eserves all rights to time extension, time related costs and any indirect cost[s] that result or flow from the changes ordered herein." Addicks's records reflect that during the relevant time frame, Bridgeland approved an extension of twelve calendar days and sixteen change orders[5] that increased the price of the Contract by $1,528,052.82 to a total of $6,110,774.61.[6] The project was certified complete on November 25, 2005, approximately eleven months behind schedule. Addicks claims that many of the claims it submitted to Bridgeland for approval were paid in part or not at all.

While the project was ongoing and many of these requests for change

---

[4] A second form, entitled "Waiver and Release of Lien upon Final Payment" (the "Final Waiver") has not been executed by Addicks.

[5] The record is deficient with regard to the change orders, as we could locate only six in scattered locations. These are change orders 5, 8, and 11–14. Change order 8 was executed three weeks prior to change order 5, and change orders 11–13 were all executed on the same day.

[6] Addicks's payment applications reflect that sixteen change orders were executed prior to November 25, 2006. The parties executed a partial settlement in June 2006 that involved a seventeenth change order. That settlement does not affect our decision, and we therefore do not consider it.

orders were pending, Addicks submitted applications for progress payments and executed Interim Waivers. Addicks asserts that Bridgeland would not permit it to include claims for work on these payment applications unless the work had been reduced to a change order. Each of the fifteen Interim Waivers that appears in the record was executed on the twenty-fifth day of the month, with only one exception,[7] from August 2004 through November 2005.[8] Each Interim Waiver corresponds to a payment application submitted by Addicks, and the amount requested in each payment application is typically identical to the amount cited in the corresponding Interim Waiver.[9] Despite the presence of a blank space for exceptions to Addicks's assertion that it "specifically waive[d], quitclaim[ed], and release[d] . . . any and all claims," Addicks did not list any claims—for extra work, delay damages, or otherwise—in any of the fifteen Interim Waivers it executed.

After the project was certified complete on November 25, 2005, Addicks and Bridgeland continued to dispute whether further payment was due. In

---

[7] The May 2005 Interim Waiver was executed on the thirty-first of that month.

[8] An additional Interim Waiver, absent from the record, was apparently executed in October 2005, but Bridgeland could not locate it during this litigation. The accounts receivable printout Addicks submitted reflects that Bridgeland paid the full amount of $256,907.05 that Addicks requested in the corresponding payment application.

[9] There were six occasions when the amounts did not precisely align. On three occasions, the amount Addicks requested and the amount recited paid by the Interim Waiver differed by no more than $1.00 (November 2004, April 2005, and September 2005). For June 2005, Addicks requested payment of $271,291.72, the June 2005 Interim Waiver recited payment of $287,932.35, and Addicks reported $275,198.31 received. For August 2005, Addicks's accounts receivable printout reflects that it initially requested $287,845.80, which is identical to the amount recited paid by the August 2005 Interim Waiver. However, the corresponding payment application, printed on September 29, 2005, requests only $126,285.50, which is the amount Addicks reported receiving from Bridgeland on October 20, 2005. The discrepancies in both June and August 2005 appear to have been addressed in a downward adjustment of $179,204.32 that Addicks made on September 25, 2005, corresponding with its September 2005 payment application. For November 2005, Addicks requested $60,729.83, which it reported receiving, while the November 2005 Interim Waiver recites payment of $59,749.00.

February 2006, Addicks filed a mechanic's and materialman's lien against the Bridgeland property in the amount of $2,257,394.97. The parties reached a partial settlement through negotiations in June 2006. In October 2006, Addicks filed a petition in state court, claiming over $3 million in damages; it has since reduced its request for relief to $2,160,957.00.[10] Addicks claimed entitlement to these damages under theories of breach of contract, quantum meruit, and promissory estoppel. Bridgeland answered on October 30, 2006,[11] and removed the case, based on diversity jurisdiction, to federal district court on November 3, 2006. Bridgeland later filed a counterclaim against Addicks for breach of contract and promissory estoppel.[12] Pursuant to 28 U.S.C. § 636(c), the parties consented to have all proceedings, including trial and judgment, proceed before a magistrate judge.

After discovery had been completed, Bridgeland moved for partial summary judgment on Addicks's claims for work performed prior to November 25, 2005—the date Addicks last executed an Interim Waiver. In response to Bridgeland's argument that Addicks had waived and released its claims for extra work and other costs prior to that date, Addicks asserted four defenses against applying the Interim Waivers to bar its claims: (1) ambiguity; (2) waiver; (3) estoppel; and (4) mutual mistake. After a hearing, the district court granted Bridgeland's motion, holding that "Addicks's claims for damages incurred prior to November 25, 2005 [we]re barred by release." Addicks Servs., Inc. v. GGP-

---

[10] Addicks arrives at this value by adding $552,600 for "added scope of work"; $1,970,352 for "cost of loss of productivity"; $142,788 for "cost of escalated fuel prices"; and $21,756 for "general conditions"; and subtracting $526,539 as "amount previously paid for additional haul distance." (Pl.'s Second Am. Compl. ¶ 11.) These damages are further broken out into specific claims for work performed or damages incurred in a Joint Report on Disputed Additional Work Items prepared jointly by Addicks and Bridgeland.

[11] Safeco also filed an answer in November 2006.

[12] Initially, Bridgeland also alleged fraud, but it has since dismissed that claim.

Bridgeland, L.P., No. H-06-3478, 2008 WL 4747343, at *6 (S.D. Tex. Oct. 27, 2008). On agreed motion by the parties, Addicks's claims for work post-November 25, 2005, were severed into a new action, and the district court entered a final judgment dismissing all of Addicks's claims with prejudice. Addicks timely appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291 because the district court rendered a final judgment disposing of all the issues in the action. The district court had original diversity jurisdiction over this removed action under 28 U.S.C. § 1332(a). We apply Texas substantive law and federal procedural law to this diversity action. See Foradori v. Harris, 523 F.3d 477, 486 (5th Cir. 2008).

We review a grant of summary judgment de novo, applying the same standard as the district court. First Am. Bank v. First Am. Transp. Title Ins. Co., 585 F.3d 833, 836–37 (5th Cir. 2009). In reviewing a grant of summary judgment, we examine the evidence in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The movant bears the burden of demonstrating that summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when a jury could properly enter a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Where the movant bears the burden of proof on an affirmative defense such as release, the movant "'must establish beyond peradventure all of the essential elements of the defense to warrant judgment in his favor.'" Chaplin v. NationsCredit Corp., 307 F.3d 368, 372 (5th Cir. 2002) (ellipsis omitted) (quoting Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir.

1986)).

## III. DISCUSSION

Addicks argues on appeal that the Interim Waivers should not be enforced to bar its claims for extra work performed and damages incurred prior to November 25, 2005. It asserts that summary judgment was inappropriate because genuine issues of material fact exist in support of three distinct theories: (1) ambiguity; (2) waiver; and (3) estoppel.[13]

### A. Ambiguity

Addicks contends first that the Interim Waivers do not, by their terms, apply to the present claims for extra work. Addicks argues alternatively that to the extent the Interim Waivers do apply to bar such claims, they are ambiguous, and the parties' course of performance—that Bridgeland would not allow it to include claims for extra work on its payment applications—presents a fact issue defeating summary judgment. We conclude that the Interim Waivers extend unambiguously to release Addicks's claims for extra work and, accordingly, the course of performance evidence may not be used to reinterpret the language of release.

In Texas, whether a contract is ambiguous is a question of law. J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003) (citing Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983)). "A contract is unambiguous if it can be given a definite or certain legal meaning. On the other hand, if the contract is subject to two or more reasonable interpretations . . . the contract is ambiguous, creating a fact issue on the parties' intent." Id. (citation omitted). "When parties disagree over the meaning of an unambiguous contract, '[t]he intent of the parties must be taken from the agreement itself, not from the parties' present interpretation, and the agreement must be enforced as it is written.'" Texas v.

---

[13] The district court rejected Addicks's claim that the parties were operating under a mutual mistake; Addicks does not press that argument on appeal.

Am. Tobacco Co., 463 F.3d 399, 407 (5th Cir. 2006) (modification in original) (quoting Purvis Oil Corp. v. Hillin, 890 S.W.2d 931, 935 (Tex. App.—El Paso 1994, no writ)). "The language in an agreement is to be given its plain grammatical meaning unless to do so would defeat the parties' intent." DeWitt County Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 101 (Tex. 1999). "Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity." Am. Tobacco Co., 463 F.3d at 407 (citing Sun Oil Co. v. Madeley, 626 S.W.2d 726, 732–33 (Tex. 1982); Gen. Accident Ins. Co. v. Unity/Waterford–Fair Oaks, Ltd., 288 F.3d 651, 657 (5th Cir. 2002)). Parol evidence—such as the parties' course of performance—may be used to ascertain the intent of the parties only if the contract is first found to be ambiguous. Id.

1. Language of the Interim Waivers

We first address the argument that language in the Interim Waivers itself gives rise to a reasonable interpretation that the Interim Waivers were not intended to release claims for extra work. Addicks cites four particular instances to support this interpretation: (1) the title "Waiver and Release of Lien Upon Progress Payment"; (2) the recitation that the release is "in consideration of" a sum certain; (3) the representation "that the payment referenced above, once received, constitutes full and complete payment for all work performed"; and (4) the statement that "[t]he amount of money set forth as due and owing in the [Interim Waiver] has been received and is deemed paid in full." Addicks insists that these excerpts evidence a mutual understanding that it released its lien and claims only to the extent of the amount specified in each Interim Waiver.

The release contemplated by the Interim Waivers is comprehensive and not susceptible to the limited interpretation urged by Addicks. With each Interim Waiver executed, Addicks "waive[d] and release[d] its lien and right to

10

claim a lien for labor, services, or materials furnished through [the date of the Interim Waiver]." Each Interim Waiver specifically excluded retention and labor, services, and materials furnished after the date of execution. Each Interim Waiver further provided that "the payment . . . , once received, constitute[d] full and complete payment for all work performed, and all costs or expenses incurred . . . except for the payment of retainage." Addicks further "specifically waive[d], quitclaim[ed] and release[d] any claim for damages due to delay, hindrance, interference, acceleration, inefficiencies or extra work, or any other claim of any kind it may have against [Bridgeland] . . . ." (emphasis added). Although each Interim Waiver contained a blank space in which Addicks could have excepted outstanding claims from the scope of the release, Addicks never excepted any claims. At the bottom of each Interim Waiver, Addicks attested that payment had been received and was deemed paid in full as of the date of the Interim Waiver. The executed Interim Waivers thus operated to release all of Addicks's outstanding claims except for retainage payments, with the progress payment serving as the consideration for the overall release.

The words and phrases that Addicks excerpts from the Interim Waivers do not yield a reasonable alternative interpretation. The word "upon" in the title of the Interim Waivers simply refers to the timing of the release—upon receipt of a progress payment, Addicks released all of its outstanding claims. Texas courts regularly treat such language as referring to the timing of a release. See, e.g., K.D.F. v. Rex, 878 S.W.2d 589, 591 (Tex. 1994) (using the words "release upon" to discuss the condition that would effectuate the release); In re Bath Junkie Franchise, Inc., 246 S.W.3d 356, 365 (Tex. App.—Beaumont 2008, no pet.) ("[T]he parties intended to create a release upon each party's performance . . . ." (emphasis added)). Similarly, the fact that the Interim Waivers recited the consideration offered for the release, stated that the release became effective

11

upon receipt of that consideration, and deemed the consideration received on the date of execution merely clarifies details of contractual formality—namely, what is being given in return for the release, and when does the release become operative? This language does not weigh against the conclusion that the Interim Waivers expressly released any and all claims up to the date of execution, with Addicks failing to except any of its outstanding claims.

Addicks also argues that the language in the Interim Waivers stating that the progress payment "constitutes full and complete payment for all work performed" necessarily releases only its claims to "Work,"[14] as defined by the Contract. Because the defined term "Work" refers only to work specified in the Contract and in change orders, Addicks maintains, the Interim Waivers may reasonably be read not to release Addicks's claims for extra work. We need not and do not decide whether the lowercase "work" in the Interim Waivers is synonymous with the uppercase "Work" defined elsewhere in the Contract because the quoted language does not constitute the sole release language in the Interim Waivers. Shortly following the quoted language, Addicks further agreed that it "specifically waive[d], quitclaim[ed] and release[d] any claim for damages due to delay, hindrance, interference, acceleration, inefficiencies or extra work, or any other claim of any kind it may have." Whether "work" refers only to "Work" is irrelevant in light of the specific references to "extra work" and "any other claim of any kind"—the latter language clearly and unambiguously describes the broad scope of the claims Addicks released. Cf. J.M. Davidson, 128 S.W.3d at 229 ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. . . . [A]ll the provisions must be considered with

---

[14] As discussed above, "Work" is defined by the Contract as "the work described in the Drawings and Specifications . . . and any requirements set forth in any other Contract Documents enumerated in [the Integration Clause]," including executed change orders.

reference to the whole instrument.").

The language of the Interim Waivers also renders this case distinguishable from Green International, Inc. v. Solis, 951 S.W.2d 384 (Tex. 1997), and Gilbane Building Co. v. Two Turners Electric Co., No. 14-05-00908-CV, 2007 WL 582252 (Tex. App.—Houston [14th Dist.] Feb. 27, 2007, pet. denied) (mem. op.). In Green International, a dispute arose between a contractor, Green International, and a subcontractor, Solis, over work performed on three prison construction projects. 951 S.W.2d at 386. An issue in the case was whether periodic waiver of lien releases barred Solis's claims for extra work performed. Id. at 388. The releases in Green International provided that Solis agreed to "release [Green International] from all claims arising out of or by reason of work performed and materials furnished under said subject Subcontract and under the Contractor's prime contract with the Owner." Id. at 388–89. The Texas Supreme Court considered whether that "global language . . . terminated Solis' recovery for his extra work," and held that it did not. Id. at 389. This conclusion led from the fact that Green International had "approved change orders for the extra work . . . several months after Solis had signed the last waiver of lien release." Id. (emphasis added). The court reasoned that because "[t]he waivers of liens were executed months before these written modifications were made, . . . the releases cannot apply to these subsequent revisions." Id. Dissimilar facts are before us in this case. First, the language of the Interim Waivers is specific with regard to excluding claims for extra work. Second, all claims for extra work at issue in this case arose before the November 2005 Interim Waiver, and those claims were never converted into "Work," as defined by the Contract, through the execution of later change orders.[15] The logic militating against a finding of release in

---

[15] This excludes the change order executed pursuant to the parties' partial settlement, which does not bear on Addicks's present claims for extra work performed before the November 2005 Interim Waiver but not reduced to a change order.

Green International thus counsels in favor of finding release here.[16]

Gilbane Building involved a dispute between an electrical subcontractor and a prime contractor on two school construction projects. 2007 WL 582252, at *5. Among the damages awarded by the jury were claims to payment for work performed prior to the execution—on each project—of a partial release and waiver of lien. Id. at *10. The releases there recited that "[s]ubcontractor hereby waives, relinquishes and releases its lien, claims and charges of every nature which have arisen by [s]ubcontractor . . . to the extent such monies have been paid . . . [.]" Id. The court found that the limiting language "to the extent such monies have been paid" made it "plain [that] the Releases exclude[d] any sums that were still owed" as of the date the releases were executed. Id. Here, in contrast, there is no such limitation—the Interim Waivers, by their terms, released all outstanding claims. Addicks could have limited the reach of this release by listing its outstanding claims in the blank space provided for exceptions from the release. In requesting us to find ambiguity in the Interim Waivers, Addicks asks us to turn back the clock and insert exceptions where it failed to do so; however, Texas law forbids us from granting that request. See Tenneco Inc. v. Enter. Prods. Co., 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained."); Stafford v. Allstate Life Ins. Co., 175 S.W.3d 537, 541 (Tex. App.—Texarkana 2005, no pet.) ("Like any other agreement, a release is subject to . . . the tenet

---

[16] Some commentators have suggested that the releases in Green International did not bar the subcontractor's claims for extra work partly because "the releases were not fully operative until the ten percent retainage had been paid, i.e., the lien releases were in exchange for one hundred percent payment, not ninety percent . . . ." Robert L. Meyers, III & Michael F. Albers, Construction Law, 51 S.M.U. L. REV. 805, 808 (1998). Even accepting this reading of Green International, the effectiveness of the Interim Waivers here is not undermined: unlike the waivers in Green International, the Interim Waivers specifically excluded from their coverage "the payment of retainage."

that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained.").

2. Texas Property Code § 53.152

Addicks urges that the Texas Property Code compels the conclusion that the Interim Waivers were not intended to extend to claims for extra work. Section 53.152 of the Texas Property Code provides:

> (a) When a debt for labor or materials is satisfied or paid by collected funds, the person who furnished the labor or materials shall, not later than the 10th day after the date of receipt of a written request, furnish to the requesting person a release of the indebtedness and any lien claimed, to the extent of the indebtedness paid. An owner, the original contractor, or any person making the payment may request the release.
>
> (b) A release of lien must be in a form that would permit it to be filed of record.

TEX. PROP. CODE ANN. § 53.152 (Vernon 2007). According to Addicks, the language "to the extent of indebtedness paid" requires that we interpret the Interim Waivers to release Addicks's claims only to the dollar amount listed. We disagree.

Section 53.152 delineates the minimal obligation of a contractor to release a lien upon receiving payment, but nothing in the statute suggests that broader releases may not be executed. One commentator describes the judicial response to this practice in the construction industry as follows: "[O]wners includ[e] releases of liens and claims in monthly payment application forms they require contractors to sign and submit. Such forms typically contain language under which contractors release owners from all rights to lien and claims 'to date.' These lien waivers and releases, when clear and unambiguous, are routinely enforced." PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., CONSTRUCTION LAW § 4:48 (2009); see also 53 AM. JUR. Trials § 367 (1995) ("The signed waiver of lien can be relied upon by the owner to extinguish a construction lien through the

15

date of the waiver."). Texas courts have upheld full releases of claims where, as here, they are supported by consideration. See Dresser Indus., Inc. v. Page Petroleum, Inc., 853 S.W.2d 505, 508 (Tex. 1993) ("[A] release . . . is an absolute bar to any right of action on the released matter." (citing Hart v. Traders & Gen. Ins. Co., 189 S.W.2d 493, 494 (Tex. 1945))); Schomburg v. TRW Vehicle Safety Sys., Inc., 242 S.W.3d 911, 915 (Tex. App.—Dallas 2008, pet. denied); Stolz v. Honeycutt, 42 S.W.3d 305, 313 (Tex. App.—Houston [14th Dist.] 2001, no pet.). Addicks has not persuaded us to read this statute, which enables owners to disencumber their projects and more easily obtain financing, as one that clouds title and increases the likelihood of litigation by turning clear releases into ambiguous instruments. We therefore decline to do so.

### 3. Lack of a Final Waiver

Lastly, Addicks cites the fact that no Final Waiver was executed and argues that claims for extra work could not have been resolved through the Interim Waivers. However, this fact does not undermine the unambiguous language in the Interim Waivers. The differences between the Interim Waivers and the Final Waiver reveal their different purposes. The Interim Waivers serve to release Addicks's lien and claims up through the date of execution, while the Final Waiver is not limited to a particular date. In addition, the Final Waiver does not contain a blank space in which to except claims from release, and it does not exclude the payment of retainage from its scope. The net effect of these distinctions is that the Interim Waivers settle claims up to the date of execution, but they contemplate the performance of further services for which Addicks could claim a lien and be entitled to compensation. The Final Waiver, in contrast, does not contemplate further services—it is, after all, final. Its purpose is to settle fully and finally any potential liens or claims outstanding when the parties agree that the project has been completed and all debts have been paid. Its absence merely reveals that a dispute arose over services performed after the

execution of the November 2005 Interim Waiver—a dispute not at issue in this appeal. The lack of a Final Waiver does not upset the effect of that Interim Waiver, which released claims arising up to the date of its execution.

4. Conclusion

The language of the Interim Waivers is unambiguous in releasing the claims that Addicks now pursues. That clarity prevents us from using evidence of the parties' course of performance to alter the terms of those Interim Waivers, and, consequently, there are no issues of material fact that would support reversal under this theory.

B. Waiver

Addicks next asserts that genuine issues of material fact exist regarding whether Bridgeland's conduct waived its right to rely on the language of the Interim Waivers against Addicks's claims.

In Texas, waiver is the "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." Sun Exploration & Prod. Co. v. Benton, 728 S.W.2d 35, 37 (Tex. 1987). "[A]n obligee may waive the obligor's requirement for strict compliance with the terms of a contract if the obligee expressly or impliedly assents to the obligor's nonconforming conduct." Fairfield Fin. Group, Inc. v. Gawerc, 814 S.W.2d 204, 209 (Tex. App.—Houston [1st Dist.] 1991, no writ); accord Bott v. J.F. Shea Co., 388 F.3d 530, 534 (5th Cir. 2004). "Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." Jernigan v. Langley, 111 S.W.3d 153, 156 (Tex. 2003) (per curiam); accord Van Indep. Sch. Dist. v. McCarty, 165 S.W.3d 351, 353 (Tex. 2005) ("While waiver may sometimes be established by conduct, that conduct must be unequivocally inconsistent with claiming a known right."). "Silence or inaction, for so long a period as to show an intention to yield the known right, is also enough to prove waiver." Tenneco, 925 S.W.2d at 643.

"Waiver is ordinarily a question of fact, but when the surrounding facts and circumstances are undisputed, . . . the question becomes one of law." Jernigan, 111 S.W.3d at 156–57; accord First Interstate Bank of Ariz., N.A. v. Interfund Corp., 924 F.2d 588, 595 (5th Cir. 1991) ("[T]he issue of waiver becomes a matter of law only where material facts and circumstances are undisputed or clearly established and there is no room for argument or inference.").

According to Addicks, it performed extra work—work requested by Bridgeland but not listed in the original specifications and not yet reduced to a change order—on thirty-four occasions. Addicks then requested that Bridgeland issue change orders and pay for the extra work. The process of negotiation over those instances of extra work led to Bridgeland issuing some change orders and paying Addicks for those thirty-four claims, even though, for each claim, Addicks had executed at least one Interim Waiver prior to Bridgeland doing so. Addicks claims that Bridgeland's failure to assert that the Interim Waivers released those claims at that time—rather than negotiate over change orders and issue payment—raises a fact issue for trial regarding whether Bridgeland impliedly waived its right to rely on the Interim Waivers. Bridgeland responds that each such change order and payment for extra work was invariably followed by a subsequent Interim Waiver that again released any outstanding claims. Bridgeland further argues that its decision to negotiate is entirely consistent with adhering to the processes laid out by the contract—processes that include the execution of Interim Waivers—and is inconsistent with waiver of its right to assert release.

We agree with Bridgeland's interpretation. The undisputed facts show that Bridgeland and Addicks followed the process for requesting change orders delineated by the Contract in their negotiations over the thirty-four claims referenced above. Also as contemplated by the Contract, Bridgeland continued to insist that Addicks execute Interim Waivers in exchange for each progress

payment. This conduct is wholly consistent with strict adherence to the Contract and wholly inconsistent with waiver of the right to rely on the Interim Waivers.[17] Proving implied waiver requires a litigant to clear a high threshold by clearly demonstrating the other party's intent to relinquish a right. Compare Jernigan, 111 S.W.3d at 157 (holding that waiting 600 days after the untimely filing of a mandatory expert's report to move to dismiss and filing motion for summary judgment on other grounds in the interim was not sufficient to establish waiver because those actions were not inconsistent with an intent to assert the right to dismissal), with Tenneco, 925 S.W.2d at 643–44 (holding as a matter of law that contractual right of first refusal for transfer of an ownership interest was waived where three years after noncomplying transfer elapsed without complaint before lawsuit was filed), and Fairfield Fin. Group, 814 S.W.2d at 208–10 (holding that a bank's acceptance of payments, over the course of eight months, that did not conform to the original repayment schedule waived the bank's right to insist on strict compliance with the original repayment schedule).[18] The facts, construed most favorably to Addicks, do not clear that threshold, and Addicks's waiver claim fails.

C. Promissory Estoppel

Finally, Addicks argues that the equitable doctrine of promissory estoppel prevents Bridgeland from claiming that the Interim Waivers released the

---

[17] In attempting to support its waiver argument, Addicks also comments that Bridgeland first "asserted the [Interim Waivers] as a defense to Addicks' claims . . . in connection with this litigation." We fail to see how asserting an affirmative defense to a cause of action in litigating a dispute suggests an intention to waive that affirmative defense.

[18] Addicks cites Green International, Gilbane, and numerous construction-dispute cases from other jurisdictions for the proposition that conduct inconsistent with a contractual right will result in a waiver of that right. Those cases deal generally with whether particular releases served to release specific claims and not with whether an owner's decision to negotiate a compromise with a contractor waives the right to rely on those releases.

present claims.[19] "The requisites of promissory estoppel are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." English v. Fischer, 660 S.W.2d 521, 524 (Tex. 1983). The alleged promise must not be "too vague and indefinite." Gillum v. Republic Health Corp., 778 S.W.2d 558, 570 (Tex. App.—Dallas 1989, no writ); accord Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 630 n.7 (5th Cir. 1985) ("The same indefiniteness that makes the putative contract unenforceable prevents Neeley from prevailing on a promissory estoppel theory."); Gilmartin v. KVTV–Channel 13, 985 S.W.2d 553, 559 (Tex. App.—San Antonio 1998, no pet.) (holding that alleged oral promises, which failed to modify a contract, "were . . . too indefinite to permit estoppel causes of action"). A promisee's "reliance must be both reasonable and justified." Vlasek v. Wal-Mart Stores, Inc., No. H-07-0386, 2007 WL 2402183, at *6 (S.D. Tex. Aug. 20, 2007) (citing Frost Crushed Stone Co. v. Odell Geer Constr. Co., 110 S.W.3d 41, 45 (Tex. App.—Waco 2002, no pet.); Gilmartin, 985 S.W.2d at 558). Where these requirements are satisfied, promissory estoppel "'prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them.'" In re Weekley Homes, L.P., 180 S.W.3d 127, 133 (Tex. 2005) (quoting Wheeler v. White, 398 S.W.2d 93, 96 (Tex. 1965)).

We conclude that Addicks's evidence fails to raise a genuine issue of material fact on whether Bridgeland made a definite promise and on whether

---

[19] Addicks also briefly mentions the doctrine of quasi-estoppel and cites one case invoking it. See Eckland Consultants, Inc. v. Ryder, Stilwell Inc., 176 S.W.3d 80, 87 (Tex. App.—Houston [1st Dist.] 2004, no pet.). "The doctrine of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party." Id. Quasi-estoppel is similar to equitable estoppel, but "[u]nlike equitable estoppel, quasi-estoppel requires no showing of misrepresentation or of detrimental reliance." Id. As discussed above, Bridgeland's conduct in negotiating change orders and payment while still obtaining Interim Waivers was not inconsistent with asserting its right to invoke the release provisions of the Interim Waivers. Addicks therefore cannot satisfy the requirements of quasi-estoppel.

Addicks reasonably relied on Bridgeland's statements.[20] The evidence Addicks cites in support of its promissory estoppel theory consists of an affidavit by its president, C. Nelson Barfield, and transcripts of voice mail messages left by Patsy Morris, Bridgeland's project manager. The alleged promises described in Barfield's affidavit amount to an assertion that Bridgeland would resolve Addicks's claims for extra work at a later date.[21] Such statements of an intention to reach agreement have been found too vague and indefinite to survive summary judgment on promissory estoppel. See Global Integrated Bldg. Sys. v. Target Logistics, LLC, No. H-06-2637, 2009 WL 259360, at *9 (S.D. Tex. Feb. 3, 2009) (holding that statements amounting to "[If you] 'can get these buildings built, I will get you paid'" are too vague and indefinite as a matter of law in a "multi-million dollar construction contract dispute"); Weitzman v. Steinberg, 638 S.W.2d 171, 176 (Tex. App.—Dallas 1982, no writ) (holding that "an agreement to agree" is too indefinite to establish promissory estoppel). Morris's voice mail messages similarly reflect the indefinite assurance of an ongoing negotiation process, rather than a commitment to perform specific acts, and do not evidence a definite promise.[22] See Gillum, 778 S.W.2d at 570 (finding

---

[20] Relating to our discussion of Addicks's ambiguity arguments above, we also note that under Texas law, promissory estoppel may not be used to circumvent the parol evidence rule. Highlands Mgmt. Co. v. First Interstate Bank of Tex., N.A., 956 S.W.2d 749, 757 (Tex. App.—Houston [14th Dist.] 1997, pet. denied); Stavert Props., Inc. v. RepublicBank of N. Hills, 696 S.W.2d 278, 282 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.).

[21] Barfield averred that "Patsy Morris promised me she would pay Addicks when the extra work was completed. . . . Ms. Morris repeatedly assured me that Addicks would get paid for all the extra work she directed Addicks to perform even though [an] approval process on some items was necessary." (Barfield Aff. 5.) He further averred that "Ms. Morris . . . said we would deal with payment later and said the items could not be billed until she said so." (Id. at 8.)

[22] In one message, Morris stated:
    David is still under the impression that he is not to do anything in those areas [the information center and berm] until you and I resolve money. I told him that wasn't my impression; that my impression was that you said you weren't going to hold anything up, you know, while we are trying to resolve it.

too vague and indefinite alleged promises that purchaser of hospital would "have sufficient funding to upgrade the hospital's equipment care; that the hospital would remain primarily a [doctors of osteopathy] hospital; that [the plaintiff] could continue to make the changes to upgrade the level of health care at the hospital; and that a new hospital facility was to be constructed" (footnote omitted)).

The vagueness and indefiniteness of the alleged promises also foreclose Addicks's claim that it has raised a fact issue regarding reasonable and justifiable reliance. See Allied Vista, Inc. v. Holt, 987 S.W.2d 138, 142 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) ("[I]n the absence of a definite promise . . . reliance [i]s not reasonable or justified as a matter of law."); Simpson v. MBank Dallas, N.A., 724 S.W.2d 102, 108 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (holding that guarantor who had "signed numerous prior guaranties in favor of MBank on the exact same guaranty form contract" could not have reasonably or justifiably relied on alleged assertion by MBank that a later guaranty was a "mere formality").

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

AFFIRMED.

---

. . . .
But I told them to stop everything until you and I can resolve this, because if we can't resolve it then I need to stop everything and I need to get someone else in here to get this fill into the information center and the berm.
Morris followed up with another message over one week later:
Yeah, nothing is resolved it's not going to be resolved until you and [the engineers] so, you know, you all kind of agree on the quantities.
My suggestion would be, like I said, that the[ engineers], you bill at your contract price for quantities, and we'll have to resolve whatever dollar amount you may or may not be over that, but we'll get you something for this dirt that you're moving for the berm and that kind of things.
(Voicemail Tr. 2–3, 5.)